UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

| | |
|---|---|
| DU'BOIS A. CROCKROM, individually and on behalf of all others similarly situated, | Civil Action No. 1:20-cv-00013 |
| Plaintiff, | **CLASS ACTION COMPLAINT** |
| v. | (DEMAND FOR JURY TRIAL) |
| BANK OF AMERICA, N.A.; and BANK OF AMERICA CORPORATION, | |
| Defendants. | |

Plaintiff Du'Bois A. Crockrom, individually and on behalf of all others similarly situated, complains and alleges as follows based on personal knowledge as to himself, on the investigation of his counsel, and on information and belief as to all other matters:

**INTRODUCTION**

1.      Plaintiff brings this Class Action Complaint against Bank of America, N.A. and Bank of America Corporation, and their present, former, or future direct and indirect parent companies, subsidiaries, affiliates, agents, and/or other entities (collectively, "Bank of America" or "Defendant"), for legal and equitable remedies resulting from Defendant's practices of assessing $35.00 fees to its personal deposit account holders for overdrafts triggered by "non-recurring" transactions made with Bank of America-issued debit cards.

2.      Between June 18, 2010 and April 6, 2017, the period of time relevant to this action, Bank of America's relationship with Plaintiff and each of its other personal deposit account holders was governed by a standardized set of contractual documents comprised of the "Deposit Agreement and Disclosures" and the incorporated "Personal Schedule of Fees" – the terms of which are drafted by Bank of America, amended by Bank of America from time to time at its convenience and complete and sole discretion, and uniformly imposed by Bank of America on all of its customers.  *See* Compl., Exhibit A (Deposit Agreement and Disclosures dated March 4, 2016 (hereinafter, the "Deposit Agreement")), at 2 ("You understand that these terms, as we may change or supplement them periodically, are a binding contract between you and us for your deposit

account and your deposit relationship."); *see id.*, <u>Exhibit B</u> (Personal Schedule of Fees dated August 12, 2016 (hereinafter, the "Schedule of Fees")), at 1 ("Your account and deposit relationship with us are governed by this schedule of fees and the Deposit Agreement and Disclosures. . . . These agreements are part of the binding contract between you and us for your account and deposit relationship.").

3.      In early 2010, Bank of America announced that, starting in June 2010, it would cease charging personal deposit account holders $35.00 fees for overdrafts triggered by "non-recurring" debit card transactions.  Bank of America explained that only "recurring" debit card transactions – i.e., purchases set up in advance to occur automatically at predetermined intervals of time without requiring any involvement by the consumer to be initiated, such as mortgage or car payments or other automatic bill payments – would be authorized into negative balances and subjected to overdraft fees under its new policy. And sure enough, on June 18, 2010, Bank of America's new overdraft fee-assessment policy was memorialized in the Deposit Agreement and Schedule of Fees, which govern Bank of America's relationship with all of its personal deposit account holders nationwide.

4.      At the time, Bank of America told *The New York Times* and other national news outlets that its new overdraft-fee policy was "all about establishing trust" with its customers, many of whom had "kept telling us, 'do not let me spend money I don't have.'"[1] And to hit the point home, Bank of America announced to its account holders that, going forward, "[y]ou will never at Starbucks have a $40 cup of latte."[2]

5.      These statements were not true.  Over the past nine years, Plaintiff has had dozens of $40 cups of latte at Starbucks, attributable to the dozens of $35.00 fees he has paid Bank of

---

[1]      Andrew Martin, "Bank of America to End Debit Card Overdraft Fees," *The New York Times*, Mar. 9, 2010, *available at* http://www.nytimes.com/2010/03/10/your-money/credit-and-debit-cards/10overdraft.html.

[2]      "Bank of America announces new information on overdraft policies," AOL.com, March 10, 2010, *available at* https://www.aol.com/2010/03/10/bank-of-america-announces-new-information-on-overdraft-policies/ (last accessed Mar. 10, 2010).

CLASS ACTION COMPLAINT

America for overdrafts triggered by debit card purchases with Starbucks.  Plaintiff's experience is shared by hundreds of thousands if not millions of other consumers nationwide, each of whom incurred at least one $35.00 overdraft fee attributable to a non-recurring purchase made using a Bank of America-issued debit card between June 18, 2010 and April 6, 2017.

6.      By assessing $35.00 fees for overdrafts triggered by one-time, non-recurring purchases made using Bank of America-issued debit cards, Bank of America breached its contractual obligations to Plaintiff and the members of the proposed Class, damaging them monetarily. On behalf of himself and the Class, Plaintiff brings this action to recover Bank of America's ill-begotten gains, and for other legal and equitable remedies.

## NATURE OF THE ACTION

7.      At all times between June 18, 2010 and April 6, 2017, Bank of America promised its account holders that it "do[es] not authorize overdrafts for everyday <u>non-recurring</u> debit card transactions and ATM transactions," and thus will "not charge you an Overdraft Item fee on an everyday <u>non-recurring</u> debit card transaction."   At the same time, Bank of America told its account holders that it *would* continue to authorize overdrafts for <u>recurring</u> debit card transactions, and thus would continue to assess Overdraft Item fees on such transactions: "We do charge you an Overdraft Item fee each time we authorize and pay any other type of overdraft transaction [besides non-recurring transactions].  These other types of transactions include checks and other transactions made using your checking account number, <u>recurring debit card transactions</u>, Online and automatic bill payments, and ACH transactions."

8.      Over this nearly seven-year period of time, Bank of America's standardized Deposit Agreement with all of its account holders drew the following distinction between "non-recurring" debit card transactions (which would not be subject to overdraft fees) and "recurring" debit card transactions (which would be subject to overdraft fees):

> Everyday non-recurring debit card transactions are usually purchases made with your debit card or debit card number on a one-time or day-to-day basis. As examples, you use your debit card for purchases of groceries, gas, or coffee in the morning. Recurring debit card transactions are usually transactions that you set up to

> occur automatically, such as automatic bill payments. As examples, you give merchants your debit card number to use for rent, mortgage, car, or utility payments.

Thus, at all times relevant to this action, Bank of America promised its accountholders that they were immune from overdraft fees while making everyday purchases using their debit cards, and that the only type of debit card transactions that could incur overdraft fees were transactions that had been set up in advance to occur automatically at predetermined intervals of time (i.e., "recurring" debit card transactions), such as monthly car or mortgage payments or other automatic bill payments that do not require any involvement by the consumer to be initiated.

9.      Nevertheless, between June 18, 2010 and April 6, 2017, Bank of America systematically broke these promises by authorizing various types of plainly non-recurring debit card transactions, with various merchants including Starbucks, into deposit accounts with insufficient balances to cover them, and then assessing a $35.00 overdraft fee as a result of each such transaction – in other words, the exact opposite of what Bank of America had promised its accountholders in the Deposit Agreement and the Schedule of Fees, as well as on the front page of *The New York Times*.

10.      Bank of America knowingly engaged in these wrongful practices to maximize its corporate profits (at the expense of its poorest and most vulnerable account holders).  For people living paycheck to paycheck, like Plaintiff and many members of the Class, Bank of America's conduct not only damaged them monetarily but had a serious effect on their everyday lives.

11.      On behalf of himself and the Class, Plaintiff seeks actual, compensatory, and consequential damages from Bank of America, to the fullest extent permitted by law, to redress the wrongful conduct alleged herein.

## JURISDICTION AND VENUE

12.      The Court has subject matter jurisdiction over this putative class action pursuant to 28 U.S.C. § 1332(d) because there are more than 100 members of the proposed class, the aggregate amount in controversy exceeds $5,000,000, exclusive of interest, fees, and costs, and at least one member of the proposed class is a citizen of a state different from Defendant.

13.     Personal jurisdiction and venue are proper in New York and within this District because Plaintiff is a citizen of New York and resides in this District; because Plaintiff maintains a personal deposit account with Bank of America at a Bank of America financial institution located in New York and within this District; because Plaintiff's claims alleged herein arose in substantial part in New York and within this District; and because Bank of America conducts substantial business in New York and within this District.

## PARTIES

14.     Plaintiff is a resident and citizen of Brooklyn, New York.  At all times mentioned herein, Plaintiff has maintained one or more personal checking accounts with Bank of America.

15.     Bank of America is a national bank that maintains its headquarters and principal place of business in Charlotte, North Carolina.  Bank of America operates banking centers in New York and throughout the United States.

## FACTUAL ALLEGATIONS COMMON TO ALL CLAIMS

### I.     OVERDRAFT FEES ARE LUCRATIVE FOR BANK OF AMERICA BUT DEVASTATING FOR ITS MOST VULNERABLE CUSTOMERS

16.     Fee-based overdraft programs cost American consumers at least $23.7 billion each year in the aggregate — more than the total amount of money loaned in exchange for such fees, which equates to approximately $21.3 billion annually.[3]  Debit card transactions, the most common trigger of overdraft fees, cause an average overdraft of approximately $17 yet result in an average

---

[3]     Leslie Parrish, *Overdraft Explosion: Bank fees for overdrafts increase 35% in two years*, Center for Responsible Lending, Oct. 6, 2009, *available at* http://www.responsiblelending.org/overdraftloans/research-analysis/crl-overdraft-explosion.pdf.

CLASS ACTION COMPLAINT

fee of approximately $35.[4]  Most consumers do not learn of an overdraft for two or more days, greatly exposing them to additional overdraft fees in the interim.[5]

17.    The overwhelming majority of overdraft fees are paid by chronic overdrafters, who are typically those least able to afford such fees or recover from them once incurred.  According to research by the Consumer Financial Protection Bureau, less than one-fifth of account holders — those who incur three or more overdraft fees, totaling over $100, each year — pay more than 90 percent of all overdraft fees triggered by debit cards, checks, and ACH electronic transactions.[6] These "heavy overdrafters" generally have household incomes below the U.S. average and pay nearly a full week's worth of their household incomes on overdraft fees each year.[7]

18.    Seniors, young adults, military families, and the unemployed are hit particularly hard.[8]  Americans aged 55 and older pay over $6.2 billion in overdraft fees annually[9] — $2.5

---

[4]    Eric Halperin, Lisa James, and Peter Smith, *Debit Card Danger: Banks offer little warning and few choices as customers pay a high price for debit card overdrafts*, Center for Responsible Lending, at 25, Jan. 25, 2007, *available at* http://www.responsiblelending.org/overdraft-loans/research-analysis/Debit-Card-Danger-report.pdf.

[5]    The Pew Charitable Trusts, *Overdrawn: Persistent Confusion and Concern About Bank Overdraft Practices*, June 2014, at 9-10, *available at* http://www.pewtrusts.org/~/media/assets/2014/06/26/safe_checking_overdraft_survey_report.pdf.

[6]    Consumer Financial Protection Bureau, *Data Point: Checking Account Overdraft*, at 18, July 2014, *available at* http://files.consumerfinance.gov/f/201407_cfpb_report_data-point_overdrafts.pdf.

[7]    "Heavy Overdrafters: A Financial Profile," The Pew Charitable Trusts, Apr. 2016, at 1, *available at* http://www.pewtrusts.org/~/media/assets/2016/04/heavyoverdrafters.pdf (last accessed July 17, 2019).

[8]    *See* FDIC Study of Bank Overdraft Programs (Nov. 2008); Leslie Parrish, *Consumers Want Informed Choice on Overdraft Fees and Banking Options, CRL Research Brief*, Apr. 16, 2008, *available at* http://www.responsiblelending.org/overdraft-loans/research-analysis/final-caravan-survey-4-16-08.pdf (last accessed July 17, 2019); *see also* Comments of the Center for Responsible Lending to Board of Governors of the Federal Reserve System on Proposed Rule to Amend Regulation E – Overdraft Practices, Part II.B.1(b), pp. 10-12, Mar. 30, 2009, *available at* http://www.responsiblelending.org/overdraft-loans/policylegislation/regulators/comments-regulation-e_overdraft-practices.pdf (last accessed July 17, 2019).

[9]    "Shredded Security: Overdraft practices drain fees from older Americans," Center for Responsible Lending, June 18, 2008, *available at* http://www.responsiblelending.org/overdraftloans/research-analysis/shredded-security.pdf (last accessed July 17, 2019).

billion for debit card/ATM transactions alone.[10]  Those who depend the most on Social Security pay $1.4 billion in overdraft fees each year.[11]

19.     As the financial toll of fee-based overdraft programs has increasingly and disproportionately fallen on the shoulders of our most vulnerable citizens, big banks have become more and more reliant on overdraft fees as a revenue source.  By way of illustration, big banks in the United States with assets exceeding $1 billion reported $11.16 billion in overdraft fee revenue in 2015 – a sum that constituted nearly two-thirds of all consumer deposit account revenue for those banks that year.

20.     For Bank of America in particular, overdraft has evolved from an occasional courtesy into a product that it depends upon for revenue.  In 2016, for instance, Bank of America generated more than $1.7 billion in revenue attributable to $35 overdraft fees, paid largely by its poorest customers.  On average, each Bank of America checking account holder pays $497.18 on overdraft fees each year.[12]

21.     Faced with heightened regulatory scrutiny in recent years, Bank of America has been forced to implement creative new strategies to satisfy its insatiable appetite for overdraft fee revenue.[13]  This case concerns one such strategy, executed by Bank of America in clear breach of the terms of its standardized contract with all of its accountholders.

---

[10]      *Id.*

[11]      *Id.* at 6, Table 1.

[12]      "Bank Fees rise to all-time high – and nobody can stop them," New York Post, Mar. 12, 2017, *available at* https://nypost.com/2017/03/12/bank-fees-rise-to-all-time-high-and-nobody-can-stop-them/ (last accessed July 17, 2019).

[13]      *See, e.g., Farrell v. Bank of America, N.A.*, Case No. 3:16-cv-00492-L-WVG (S.D. Cal.) ($66.6 million settlement for improper extended overdraft fees); *Bodnar v. Bank of America, N.A.*, Case No. 5:14-cv-3224-EGS (E.D. Pa.) ($27.5 million settlement for improper overdraft fees charged despite sufficient available funds); *Pantelyat v. Bank of America, N.A.,* Case No. 1:16-cv-8964-AJN (S.D.N.Y.) ($22 million settlement for improper overdraft fees charged on non-recurring Uber transactions); *Owens, et al. v. Bank of America, N.A.,* Case No. 1:19-cv-20614-MGC (S.D. Fla.) ($4.95 million settlement for improper overdraft fees charged on non-recurring transactions with Lyft, among other merchants).

CLASS ACTION COMPLAINT

## II. BANK OF AMERICA PROMISES NOT TO CHARGE OVERDRAFT FEES FOR NON-RECURRING DEBIT CARD TRANSACTIONS, AND THEN SYSTEMATICALLY CHARGES THEM ANYWAY

22. Bank of America provides retail banking products and services to tens of millions of consumers nationwide.

23. For over the past 25 years, Bank of America has issued debit cards to its personal deposit account holders, including Plaintiff and members of the Class, which are used by its customers to withdraw money and make both "recurring" and "non-recurring" purchases with merchants.

### A. In 2010, Bank of America Began for the First Time Distinguishing Between "Non-Recurring" and "Recurring" Debit Card Transactions for Purposes of Assessing Overdraft Fees

24. In early 2010, Bank of America suddenly announced that, starting in June of that year, it would no longer authorize (and would thus no longer assess $35 fees for) overdrafts caused by "one-time," "non-recurring" debit card transactions, but would continue to authorize (and thus continue to assess $35 fees for) overdrafts caused by "recurring" debit card transactions.

25. Seizing on the distinction it had drawn between "non-recurring" and "recurring" debit card transactions for purposes of assessing overdraft fees, Bank of America actually began touting itself as a consumer advocate in the media. For example, an executive at Bank of America named Susan Faulkner was quoted by CNN at the time as follows: "Our customers have been clear that they want to know if a purchase is going to overdraw their account."[14] Around the same period of time, an article in *The New York Times* stated: "In a move that could bring an end to the $40 cup of coffee, Bank of America said on Tuesday that it was doing away with overdraft fees on purchases made with debit cards[.] Bank [of America] officials said that effective this summer, customers who try to make purchases with their debit cards without enough money in their

---

[14] "BofA to scrap overdraft fees on debit purchases," CNN Money, Mar. 10, 2010, *available at* http://money.cnn.com/2010/03/10/news/companies/Bank_of_America_overdraft_fees/ (last accessed July 17, 2019) (emphasis added).

checking accounts will simply be declined."[15]  Ms. Faulkner was quoted in the piece in *The New York Times* as well: "What our customers kept telling me is 'just don't let me spend money that I don't have'. . . .  We wanted to help them avoid those unexpected overdraft fees."[16]

26.     As a result of this public media blitz, Bank of America's account holders came to expect that, going forward, Bank of America would only authorize a non-recurring debit card transaction if the accountholder had sufficient funds available to cover the transaction, and that under no circumstances would the transaction result in the assessment of an overdraft fee.

**B. Bank of America Amends the Deposit Agreement to Provide Absolute Overdraft-Fee Immunity for Non-Recurring Debit Card Transactions**

27.     In June 2010, consistent with its widely publicized statements to *The New York Times*, CNN, and other national news outlets, Bank of America took pen to paper and memorialized these significant, material promises in the Deposit Agreement and Schedule of Fees, the standardized documents which govern the terms of Bank of America's relationship with all of its personal checking account holders nationwide, including Plaintiff and the other members of the proposed Class.

28.     Specifically, the version of the Deposit Agreement issued on June 18, 2010 (the pertinent terms of which remained in effect without amendment or alteration until April 7, 2017), stated in relevant part:

> OVERDRAFT AND DECLINED OR RETURNED ITEMS
> When we determine that you do not have enough available funds in your account to cover a check or other item, then we consider the check or other item an insufficient funds item.  If you have enrolled in one of the optional Overdraft Protection plans and have enough available funds in the linked account under the Overdraft Protection plan, we transfer funds to cover the item.  Otherwise, without notice to you, we either authorize or pay the insufficient funds item and overdraw your account (an overdraft item) or we decline or return the insufficient funds item without payment (a returned item). . . .

---

[15]     Andrew Martin, *Bank of America to End Debit Card Overdraft Fees*, The New York Times, Mar. 9, 2010, *available at* http://www.nytimes.com/2010/03/10/your-money/credit-and-debit-cards/10overdraft.html (emphasis added).

[16]     *Id.* (emphasis added).

CLASS ACTION COMPLAINT

PERSONAL ACCOUNTS - OVERDRAFT PRACTICES AND SETTINGS

<u>With our Standard Overdraft Setting, we do not authorize overdrafts for everyday non-recurring debit card transactions and ATM transactions. This means that we decline everyday non-recurring debit card transactions and ATM transactions when we determine that at the time of the transaction you may not have enough available funds in your account (or in any applicable Overdraft Protection plan) to cover the transaction</u> . . . . With this overdraft setting, we may authorize and pay overdrafts for other types of transactions. Other types of transactions include checks and other transactions made using your checking account number, recurring debit card transactions, ACH transactions, preauthorized payments, and automatic and online bill payments.

Ex. A at 11-13, 21-22 (emphasis added).

29.     At all times between June 18, 2010 and April 6, 2017, the Deposit Agreement distinguished between "non-recurring" and "recurring" debit card transactions as follows:

> *What are everyday non-recurring debit card transactions and what are recurring debit card transactions?* Everyday non-recurring debit card transactions are usually purchases made with your debit card or debit card number on a one-time or day-to-day basis. As examples, you use your debit card for purchases of groceries, gas, or coffee in the morning. Recurring debit card transactions are usually transactions that you set up to occur automatically, such as automatic bill payments. As examples, you give merchants your debit card number to use for rent, mortgage, car, or utility payments.

*Id.* at 12.  Thus, at all times relevant to this action, the Deposit Agreement defined a "recurring" debit card transaction as one that is set up in advance to occur automatically at a predetermined interval of time, without requiring any involvement by the consumer to be initiated (such as monthly car or mortgage payment or another type of automatic bill payment), and defined a "non-recurring" debit card transaction as any debit card transaction that is not a "recurring" transaction but rather is made on an "everyday" or "day-to-day" basis (i.e., any debit card transaction that is not set up in advance to occur automatically at a predetermined interval of time, and which thus requires some sort of involvement by the consumer to be initiated), such as a transaction with a coffee shop, a grocery store, or a gas station.

30.     The Deposit Agreement incorporated by reference a document the Schedule of Fees.  At all times between June 18, 2010 and April 6, 2017, the Schedule of Fees stated, in pertinent part:

> <u>We do not charge you an Overdraft Item fee on an everyday non-recurring debit card transaction</u>. We also do not charge you an Overdraft Item fee on a ATM transaction unless you agreed to our overdraft practices for that particular ATM transaction. We do charge you an Overdraft Item fee each time we authorize and pay any other type of overdraft transaction. These other types of transactions include checks and other transactions made using your checking account number, recurring debit card transactions, Online and automatic bill payments, and ACH transactions.

*See* Ex. B, at 13 (emphasis added).

31.     In July 2014, Bank of America drafted and imposed upon all of its account holders a document entitled "Important Information about Your Card Agreement and Disclosure," attached hereto as <u>Exhibit C</u>, which stated in pertinent part:

> Overdrafts and Unposted Transactions
> <u>When you do not have enough available funds in your account … to cover everyday non-recurring debit card purchases or ATM withdrawals, we will decline the transaction and you will not be subject to overdraft fees</u>.  For checks, ACH, recurring debit card transactions and online bill payments, we may decline or return the transaction unpaid or we may complete it and overdraw your account.

*See* Ex. C, ¶¶ 4b, 7 (emphasis added).

32.     From June 18, 2010 through April 6, 2017, Bank of America reiterated these overdraft fee-assessment policies on its website, stating as follows:

> ATM withdrawals and everyday, non-recurring debit card transactions (individual debit card purchases such as at the grocery store or a one-time online purchase), will only be authorized when we determine you have enough available funds in your eligible account or in your eligible linked Overdraft Protection account at the time of the transaction. Otherwise, we typically decline the transaction and we do not charge an Overdraft Item fee.
>
> For other types of transactions, such as checks, Bill Pay and other electronic payments, as well as recurring debit card payments we may pay transactions when you don't have enough available funds in your checking account or linked Overdraft Protection account at the time of the transaction.

*See* Glossary of Banking Terms, Definition of "Standard Setting," *available at* https://www.bankofamerica.com/deposits/manage/glossary.go (version of page in effect on Oct. 26, 2016), a copy of which is attached hereto as Exhibit D.

33.     Likewise, the "FAQ" section of Bank of America's website stated as follows between June 18, 2010 and April 6, 2017:

> When you use your debit card for everyday, non-recurring purchases, when we determine you don't have enough funds in your account or linked Overdraft Protection account our standard practice is to decline the transaction, and we do not charge an overdraft fee.
>
> For other types of transactions – like checks, Bill Pay and other electronic payments, as well as recurring debit card payments – made using your checking account number, we may charge you a NSF: Returned Item fee each time we decline or return one of these transactions. If we pay one of these transactions, we charge you an Overdraft Item fee.

*See* "FAQs: Overdraft Services," Bank of America, N.A., *available at* https://www.bankofamerica.com/deposits/manage/faq-overdraft-services.go (version of page in effect on Nov. 3, 2016), at 4, a copy of which is attached hereto as Exhibit E.

34.     Another part of the "FAQ" section of Bank of America's website in effect at that time stated: "We do not charge you an Overdraft item fee on an everyday non-recurring debit transaction." *See* "FAQs: Bank Account Rates and Fees," Bank of America, N.A., *available at* https://www.bankofamerica.com/deposits/manage/faq-account-rates-fees.go (version of page in effect on Nov. 3, 2016), at 1, a copy of which is attached hereto as Exhibit F.

35.     And in the "Checking Clarity Statement" issued to all account holders, described as providing "checking fee and policy information in a simple format so you know the ins and outs of your account," including an "[o]verview of Bank of America Core Checking key policies and fees," Bank of America stated as follows between June 18, 2010 and April 6, 2017: "To help you avoid fees, we won't authorize ATM withdrawals or everyday debit card purchases when you don't have enough money in your account at the time of the transaction." *See* "Overview of Bank of America Core Checking key policies and fees," Bank of America, N.A., Nov. 2016, a copy of which is attached hereto as Exhibit G.

36.     Thus, in the Deposit Agreement, Schedule of Fees, and other account-related documentation in effect between June 18, 2010 and April 6, 2017, Bank of America promised its personal deposit account holders, including Plaintiff and the other members of the Class, that it would only assess $35 fees for overdrafts triggered by "recurring" debit card transactions and would never assess $35 fees for overdrafts triggered by non-recurring debit card transactions.

### C. Bank of America Repeatedly Assesses $35 Fees for Overdrafts Triggered by "Non-Recurring" Debit Card Transactions, in Clear Breach of the Deposit Agreement

37.     The overdraft-fee assessment practices employed by Bank of America between June 18, 2010 and April 6, 2017 were directly contrary to Bank of America's promises in the Deposit Agreement, the Schedule of Fees, and the other account-related documentation in effect during that same period of time, in two primary ways.

38.     <u>First</u>, between June 18, 2010 and April 6, 2017, Bank of America processed as "recurring" many debit card transactions that were plainly "non-recurring" within the meaning of the Deposit Agreement.  For example, debit card transactions performed with Uber, Lyft, Starbucks, and numerous other merchants were misclassified during this period of time as "recurring" debit card transactions, even though such transactions were plainly "non-recurring" within the meaning of the Deposit Agreement.  Indeed, during the pertinent period of time, the transactions at issue in this case were not and indeed could not be set to occur automatically at predetermined intervals of time, such as on a weekly, monthly, or yearly basis, and all such transactions were initiated as a result of actions taken by the accountholder.  Accordingly, all of the debit card transactions at issue in this case were obviously "non-recurring" transactions (and clearly not "recurring" transactions) within the meaning of the Deposit Agreement.

39.     <u>Second</u>, Bank of America seized upon the erroneous "recurring" classifications that had been assigned to these plainly "non-recurring" transactions as pretext to authorize the transactions into negative account balances and then assess $35 fees for the overdrafts they caused. But as previously discussed, because the transactions at issue in this case fell both squarely within the meaning of the term "non-recurring" as set forth in the Deposit Agreement and squarely outside

the meaning of the term "recurring" as set forth in the Deposit Agreement, Bank of America was contractually prohibited from authorizing these transactions into insufficient balances much less assessing $35 fees for the overdrafts they caused.

40.     These practices were not only contrary to Bank of America's contractual obligations to its account holders, they also flew directly in the face of Bank of America's supposedly "consumer friendly" overdraft fee policies – which it cynically claimed to have implemented "to help [customers] avoid . . . unexpected overdraft fees" by "[not] let[ting] [them] spend money that [they] don't have."

### III.   BANK OF AMERICA KNEW THAT NON-RECURRING TRANSACTIONS WERE TRIGGERING OVERDRAFT FEES BUT KEPT PROMISING ITS CUSTOMERS THAT NON-RECURRING TRANSACTIONS WOULD NEVER TRIGGER OVERDRAFT FEES

41.     Both prior to and throughout the pertinent June 18, 2010 through April 6, 2017 time period, Bank of America was keenly aware that "non-recurring" transactions with Starbucks and numerous other merchants, including Uber and Lyft, were incorrectly processed as "recurring" transactions and would cause its customers' accounts to overdraft and thus incur overdraft fees.

42.     First, for at least a year leading up to June 18, 2010, the date on which Bank of America promised not to assess any overdraft fees for "non-recurring" debit card transactions, Bank of America knew that it could not keep this promise to its customers unless it made substantial technological changes to its systems and received significant cooperation from the merchants with whom its customers use debit cards to transact.  Indeed, in a March 30, 2009 letter to the Board of Governors of the Federal Reserve System, Bank of America demonstrated that it was well aware that many debit card transactions that were actually "non-recurring" (within the meaning of the term in the Deposit Agreement, i.e., not set up in advance to occur at a predetermined interval of time) were being misclassified as "recurring" debit card transactions, and that it appreciated how "difficult" it would be to "accurately distinguish between recurring debit card transactions and one-time debit card transactions" absent "a concerted effort by the associations, the acquirers and the merchants."  The letter states, in pertinent part:

> A bank's ability to distinguish between one-time debit transactions and recurring debit transactions is limited.  Under card association rules, merchants are supposed to code recurring debit transactions differently than one-time debit card transactions.  <u>Our experience suggests that merchants are inconsistent at best in complying with this aspect of the association rules.</u>   It is a difficult rule for the associations to enforce.  It would take a concerted effort by the associations, the acquirers and the merchants to consistently and accurately distinguish between recurring debit transactions and one-time debit transactions.

(<u>Exhibit H</u> hereto, at 23 (emphasis added).) The letter went on:

> Moreover, our experience is that the only tool banks currently have to distinguish between one- time debit card transactions and recurring debit card transactions is a code provided by the merchant as part of the authorization process. A bank's ability to comply with a requirement to treat recurring debit transactions differently from one-time debit transactions is wholly reliant upon the merchants. Our experience is that merchants are inconsistent at best in coding recurring transactions properly.   <u>Any rule that distinguishes recurring debit transactions from one-time debit card transactions will meet with limited compliance unless and until merchants more consistently provide the necessary information.</u>

(*Id.* at 25 (emphasis added).)  Nonetheless, Bank of America acknowledged in the letter that, although it did "not have the capacity today [i.e., in March 2009] to treat" non-recurring debit card transactions differently from recurring debit card transactions for purposes of assessing overdraft fees, it would be able "to develop th[e] technology" necessary to do so with "sufficient lead time." (*Id.* at 27.)

43.      Despite knowing since as far back as 2009 that any promise of absolute overdraft-fee protection for non-recurring debit card transactions could not be kept without first developing better technology, actively coordinating with merchants and other relevant players in the fintech industry, and/or making important disclosures to its customers, Bank of America chose to do none of these things before unequivocally promising all of its customers that all "non-recurring" debit card transactions (within the meaning of the Deposit Agreement) were immune from overdraft fees.  Specifically, Plaintiff is informed and believes that, prior to making these promises to all of its personal deposit account holders – both publicly in *The New York Times* and contractually in the Deposit Agreement – Bank of America took no measures to (1) deploy the technology necessary to properly distinguish between "non-recurring" and "recurring" debit card transactions

CLASS ACTION COMPLAINT

(within the meanings of those terms in the Deposit Agreement, notwithstanding merchants' classifications of the transactions) in order to properly classify the debit card transactions at issue in this case for overdraft fee-assessment purposes, (2) program its systems not to charge $35 fees as a result of overdrafts triggered by debit card transactions with merchants whose transactions are known to be "non-recurring" within the meaning of the Deposit Agreement (such as Lyft, Uber, and Starbucks, among innumerable others), or (3) to the extent Bank of America was unwilling to do either of the foregoing, disclose to its accountholders that it relies entirely on merchant classifications of transactions in deeming debit card transactions to be "recurring" within the meaning of the Deposit Agreement (and that many merchants' transactions are improperly classified as "recurring" when in fact they are not).

44.     Thus, prior to announcing its new overdraft fee-assessment policy in 2010, Bank of America was fully aware that, having failed to implement any of the foregoing measures, its customers (largely its poorest) would rely on its promises of overdraft-fee immunity for all "non-recurring" debit card transactions (within the meaning of the Deposit Agreement) only to nonetheless incur massive numbers of improperly assessed $35 fees for overdrafts caused by everyday "non-recurring" debit card transactions made with numerous merchants. And that is exactly what happened (as discussed above).

45.     Plaintiff is informed and believes that, beginning shortly after Bank of America unleashed its revised Deposit Agreement on its accountholders in June 2010, falsely promising overdraft-fee immunity for non-recurring debit card transactions initiated by all of its customers nationwide, and continuing up until April 6, 2017, the date on which it finally revised the Deposit Agreement to accurately disclose its practices, Bank of America received numerous complaints from customers who had incurred overdraft fees as a result of transactions that were plainly "non-recurring" within the meaning of the Deposit Agreement.

46.     For example, on March 31, 2015, an individual going by the name "aldo" sent a complaint to Bank of America via its official company Twitter account concerning non-recurring debit card transactions with Kickstarter that had triggered overdraft fees to his account.  Bank of

America acknowledged receiving aldo's complaint by sending him a message in response on Twitter. The exchange between aldo and Bank of America is shown in the screenshot below:



47.     As another example, from June 2015 through October 2015, an individual named John E. Guzzardo sent multiple complaints to Bank of America via its official company Twitter account concerning non-recurring debit card transactions with Uber and Lyft that had triggered overdraft fees to his account. Bank of America acknowledged receiving Mr. Guzzardo's complaints by sending him messages in response on Twitter. These exchanges between Mr. Guzzardo and Bank of America are shown in the screenshots below:





CLASS ACTION COMPLAINT

48.     As yet another example, on December 8, 2015, an individual going by the name "JERK" sent a complaint to Bank of America via its official company Twitter account concerning non-recurring debit card transactions with Uber that had triggered overdraft fees to his account. Bank of America acknowledged receiving JERK's complaint by sending him a message in response on Twitter. The exchange between JERK and Bank of America is shown below:



(redaction added).

49.     As still another example, on June 15, 2016, an individual named Ty Perkins sent a complaint to Bank of America via its official company Twitter account concerning non-recurring debit card transactions with Uber and Lyft that had triggered overdraft fees to his account.  Bank of America acknowledged receiving Mr. Perkins's complaint by sending him a message in response on Twitter. The exchange between Mr. Perkins and Bank of America is shown below:



CLASS ACTION COMPLAINT

50.     As a final example, on April 27, 2017, an individual going by the name "Phoonmz"

sent a complaint to Bank of America via its official company Twitter account concerning non-

recurring debit card transactions generally that had resulted in the assessment of overdraft fees to

his account.  Bank of America acknowledged receiving Phoonmz's complaint by sending him a

message in response on Twitter. The exchange between Phoonmz and Bank of America is shown

in the screenshot below:



51.     Plaintiff is informed and believes that thousands of similar complaints concerning

Bank of America's assessment of $35 fees as a result of overdrafts improperly triggered by

everyday, "non-recurring" debit card transactions (within the meaning of the Deposit Agreement)

– made with numerous merchants, including without limitation Starbucks, Lyft, Uber, and PayPal

– were also voiced to Bank of America by consumers on Facebook, over the telephone, in writing,

and by e-mail.

52.     In light of the letter that Bank of America sent to the Federal Reserve System in

March 2009, as well as the flood of customer complaints received by Bank of America from mid-

2010 through mid-2017 – concerning numerous merchants whose everyday "non-recurring" debit

card transactions had improperly triggered overdraft fees – there can be no doubt that Bank of

America was fully aware of that it was systematically assessing improper overdraft fees to its

customers' personal deposit accounts as a result of "everyday," "non-recurring" debit card

transactions (made with Lyft, Uber, Starbucks, and numerous other merchants) between June 18, 2010 and April 6, 2017 – the same period of time in which Bank of America was unequivocally promising its customers that they would never be assessed overdraft fees for such transactions.

53.     For nearly seven years, Bank of America assessed $35 overdraft fees to the accounts of its poorest customers in this way, in clear breach of the Deposit Agreement, reaping sizable revenues as a result.  In 2016, for instance, at the height of this scheme, Bank of America generated more than $1.7 billion in revenue attributable to $35 overdraft fees – attributable in substantial part to its assessment of the fees that Plaintiff seeks to recover in this action.

54.     Bank of America's misconduct continued up until it was sued for it.  On November 17, 2016, Bank of America was sued by a plaintiff and putative nationwide class in the U.S. District Court for the Southern District of New York.  *Pantelyat v. Bank of America, N.A., et al.,* No. 1:16-cv-08964-AJN (S.D.N.Y.).  The complaint in the *Pantelyat* action alleged, inter alia, that Bank of America breached the Deposit Agreement with accountholders by collecting fees overdrafts triggered by non-recurring debit card transactions with the ride-share company Uber.

55.     On April 6, 2017, Bank of America finally amended its Deposit Agreement to disclose the following critical piece of information to its accountholders: "We rely on the merchant that processes the transaction to determine if it is a recurring "transaction or an everyday non-recurring transaction." (*See, e.g.,* Deposit Agreement dated Nov. 10, 2017, attached as Exhibit I hereto, at 19.)

56.     Plaintiff brings this action to recover all the remaining, still-to-be-repaid overdraft fees that Bank of America improperly collected between June 18, 2010 and April 6, 2017 as a result of "non-recurring" debit card transactions that were improperly processed as "recurring" debit card transactions, including debit card transactions with Starbucks and the numerous other merchants whose debit card transactions were not set up to occur automatically at predetermined intervals of time (and which required involvement by the consumer to be initiated) but were knowingly allowed to trigger overdraft fees *en masse* by Bank of America.

IV.   **BANK OF AMERICA REPEATEDLY ASSESSES OVERDRAFT FEES FOR NON-RECURRING DEBIT CARD PURCHASES MADE BY PLAINTIFF**

57.     Between June 18, 2010 and April 6, 2017, Bank of America routinely assessed $35 fees to Plaintiff's personal deposit account for overdrafts that were triggered by debit card transactions that were plainly "non-recurring" within the meaning of the Deposit Agreement.

58.     For example, on November 3, 2015, November 4, 2015, and November 5, 2015, Plaintiff used his Bank of America debit card to perform five separate transactions to pay for purchases at Starbucks, the coffee company, in the amounts of $10.00, $10.00, $30.00, $15.00, and $20.00.  Each of these transactions constituted a "non-recurring" debit card transaction within the meaning of the Deposit Agreement and related documents in effect between June 18, 2010 and April 6, 2017 because none of them had been set up to occur automatically at a predetermined interval of time (and each of them had been initiated as a result of an action taken by Plaintiff). Because each of these five debit card transactions constituted a "non-recurring" transaction within the meaning of the Deposit Agreement, Bank of America was prohibited from assessing an overdraft fee to Plaintiff's checking account as a result of any of them.  Nevertheless, Bank of America permitted each of these plainly "non-recurring" debit card transactions (within the meaning of the Deposit Agreement) with Starbucks to overdraft Plaintiff's checking account and incur a $35 overdraft fee (for a grand total of $175.00 in overdraft fees for three days' worth of coffee purchases at Starbucks).

59.     On several other occasions between June 18, 2010 and April 6, 2017, Plaintiff was also improperly assessed $35 fees by Bank of America for overdrafts triggered by debit card purchases with various other merchants, none of which had been set up to occur automatically at a predetermined interval of time (and all of which had been initiated as a result of an action taken by Plaintiff).

60.     The Deposit Agreement and other related account documents in effect between June 18, 2010 and April 6, 2017 expressly prohibited the authorization of, let alone the imposition of overdraft fees as a result of, the "non-recurring" debit card transactions made by Plaintiff (as well as the "non-recurring" debit card transactions made by the unnamed Class members with

Starbucks as well as various other merchants, each of which likewise incurred an improper $35 overdraft fee).

61.     By imposing and collecting overdraft fees as a result of these one-time, "non-recurring" debit card transactions authorized into negative account balances between June 18, 2010 and April 6, 2017, Bank of America breached the Deposit Agreement, the Schedule of Fees, and the other account-related documents that governed its relationship with Plaintiff and the other members of the Class over that period of time, causing substantial monetary damages.

## CLASS ALLEGATIONS

62.     Plaintiff brings this action on behalf of himself and all others similarly situated pursuant to Rule 23 of the Federal Rules of Civil Procedure.  This action satisfies the numerosity, commonality, typicality, adequacy, predominance, and superiority requirements of Rule 23.

63.     The proposed Class is defined as:

> All individuals in the United States who, at any time between June 18, 2010 and April 6, 2017, held a personal deposit account with Bank of America that was assessed an overdraft fee by Bank of America as a result of a Bank of America-issued debit card transaction that had not been set up to occur automatically at a predetermined interval of time, except for such debit card transactions made with the following merchants: Uber Technologies, Inc., Lyft, Inc., Grubhub, Inc., Gett, Inc., Eatstreet, Inc., PicMonkey LLC, Neighborfavor, Inc., AMI Entertainment Network, LLC, SeamlessWeb Professional Solutions LLC, Doordash. Inc., Postmates Inc., and Eat24Hours.com, Inc.

64.     Plaintiff reserves the right to modify or amend the definition of the proposed Class before the Court determines whether certification is appropriate.

65.     Excluded from the Class are Bank of America, its parents, subsidiaries, affiliates, officers and directors, any entity in which Bank of America has a controlling interest, all customers who make a timely election to be excluded, governmental entities, and all judges assigned to hear any aspect of this litigation, as well as their immediate family members.

66.     The members of the Class are so numerous that joinder is impractical.   On information and belief, the Class consists of millions of members, the identities of whom are within

the knowledge of Bank of America and can be ascertained only by resort to Bank of America's records.

67.     The claim of the representative Plaintiff is typical of the claims of the Class in that the representative Plaintiff, like all Class members, was charged overdraft fees by Bank of America between June 18, 2010 and April 6, 2017 as a result of Bank of America-issued debit card transactions that were "non-recurring" within the meaning of the Deposit Agreement and were authorized into negative balances.  Plaintiff, like all Class members, has been damaged by Bank of America's misconduct in that he was assessed unlawful overdraft charges in breach of the governing Deposit Agreement.  Furthermore, the factual basis of Bank of America's misconduct is common to all Class members and represents a common thread of unlawful, unfair, and unconscionable conduct resulting in injury to all members of the Class.

68.     There are numerous questions of law and fact common to the Class and those common questions predominate over any questions affecting only individual Class members. Among the questions of law and fact common to the Class are whether Bank of America:

      a.   Authorized into a negative account balance between June 18, 2010 and April 6, 2017, debit card transactions that were not set up to occur automatically at a predetermined interval of time, such that the transactions were in fact "non-recurring" within the meaning given to that term by the Deposit Agreement in effect between June 18, 2010 and April 6, 2017;

      b.   Assessed overdraft fees between June 18, 2010 and April 6, 2017 as a result of debit card transactions that were not set up to occur automatically at a predetermined interval of time, such that the transactions were in fact "non-recurring" within the meaning given to that term by the Deposit Agreement in effect between June 18, 2010 and April 6, 2017;

      c.   The proper method or methods by which to measure damages;

      d.   Whether the Class is entitled to interest that has accrued on any improperly assessed overdraft fees; and

CLASS ACTION COMPLAINT

e.  The declaratory relief to which the Class is entitled.

69.     Plaintiff's claim is typical of the claims of other Class members in that all such claims arise out of the same overdraft policies governed by Bank of America's Deposit Agreement and other related documents in effect between June 18, 2010 and April 6, 2017, and arise out of the same conduct and practice of Bank of America in assessing overdraft fees as a result of the same type of debit card transactions made between June 18, 2010 and April 6, 2017.  Plaintiff has no interests antagonistic to the interests of any other Class member.

70.     Plaintiff is committed to the vigorous prosecution of this action and has retained competent counsel experienced in the prosecution of consumer class actions.  Accordingly, Plaintiff is an adequate representative and will fairly and adequately protect the interests of the Class.

71.     A class action is superior to other available methods for the fair and efficient adjudication of this controversy.  Since the amount of each individual Class member's claim is small relative to the complexity of the litigation, and due to the enormity of the financial resources of Bank of America, no Class member could afford to seek legal redress individually for the claims alleged herein.  Therefore, absent a class action, the Class members would lose their rights by attrition, and Bank of America's misconduct could continue with impunity.

72.     Even if Class members themselves could afford such individual litigation, the court system could not.  Given the complex legal and factual issues involved in this action, individualized litigation would significantly delay and cause expense to all parties and the Court. Individualized litigation would also create the potential for inconsistent or contradictory rulings. By contrast, a class action presents far fewer management difficulties, allows claims to be heard which might otherwise go unheard because of the relative expense of bringing individual lawsuits, and provides the benefits of adjudication, economies of scale, and comprehensive supervision by a single court.

CLASS ACTION COMPLAINT

## SOLE CLAIM FOR RELIEF

**BREACH OF CONTRACT**
**(By Plaintiff Individually and On Behalf**
**of the Class Against Bank of America)**

73.     Plaintiff repeats and incorporates herein all allegations from the preceding paragraphs.

74.     Plaintiff and all members of the Class contracted with Bank of America for bank account deposit, checking, ATM, and debit card services, as embodied in Bank of America's Deposit Agreement, Schedule of Fees, and related account documentation in effect between June 18, 2010 and April 6, 2017.

75.     Bank of America breached the terms of the Deposit Agreement and related account documentation in effect between June 18, 2010 and April 6, 2017 by assessing overdraft fees to the personal deposit accounts of Plaintiff and the other members of the Class between June 18, 2010 and April 6, 2017 as a result of Bank of America-issued debit card transactions that were "non-recurring" within the meaning of the Deposit Agreement in effect during that period of time.

76.     In its Deposit Agreement, Schedule of Fees, and related account documentation in effect between June 18, 2010 and April 6, 2017, Bank of America promised Plaintiff and all other members of the Class (1) that it would not authorize, and would not assess an overdraft fee as a result of, a "non-recurring" debit card transaction (within the meaning of the Deposit Agreement, i.e., any debit card transaction that had not been set up to occur automatically at a predetermined interval of time, such that involvement by the accountholder was necessary for the transaction to initiate) if there were insufficient funds to cover the transaction; and (2) that it would authorize, and would assess an overdraft fee as a result of, a "recurring" debit card transaction (within the meaning of the Deposit Agreement, i.e., a debit card transaction that had been set up to occur automatically at a predetermined interval of time, such that no involvement by the accountholder was necessary for the transaction to initiate) if there were insufficient funds to cover the transaction. *See* Ex. A, at 12-13.

77.     Bank of America breached the express terms of the Deposit Agreement and other related account documentation in effect between June 18, 2010 and April 6, 2017 when it authorized into a negative balance, and then assessed overdraft fees to, debit card transactions made between June 18, 2010 and April 6, 2017 that had not been set up to occur automatically at a predetermined interval of time (and which required involvement by the accountholder to initiate), including without limitation Plaintiff's debit card transactions with Starbucks, as alleged above.

78.     Specifically, with respect to the named Plaintiff, Bank of America breached its contractual promises to Plaintiff by, between June 18, 2010 and April 6, 2017, assessing overdraft fees for one-time, "non-recurring" debit card transactions (within the meaning of the term "non-recurring" in the Deposit Agreement and other related account documentation in effect between June 18, 2010 and April 6, 2017) with Starbucks and other merchants.

79.     At no time between June 18, 2010 and April 6, 2017 did any contractual provision exist that authorized Bank of America to charge Plaintiff or any other Class member overdraft fees as a result of any debit card transactions that had not been set up to occur automatically at predetermined intervals of time (such that involvement by the accountholder was necessary to initiate the transaction).

80.     Plaintiff and each member of the Class has performed all of the obligations imposed on him or her under the Deposit Agreement and related documentation in effect between June 18, 2010 and April 6, 2017.

81.     Plaintiff and all members of the Class sustained monetary damages between June 18, 2010 and April 6, 2017 as a result of Bank of America's breaches of the Deposit Agreement and related account documentation in effect between June 18, 2010 and April 6, 2017.

### **PRAYER FOR RELIEF**

WHEREFORE, Plaintiff Du'Bois A. Crockrom, individually and on behalf of the Class, demands a trial by jury on all claims so triable and judgment as follows:

A.     Awarding damages in an amount according to proof;

B.     Awarding restitution for all overdraft fees collected by Bank of America by Plaintiff and the members of the Class resulting from the wrongs alleged herein in an amount to be determined at trial;

C.     Awarding pre-judgment interest at the maximum rate permitted by applicable law;

D.     Awarding costs and disbursements incurred by Plaintiff in connection with this action, including reasonable attorneys' fees pursuant to applicable law; and

E.     Awarding such other relief as this Court deems just and proper.

## JURY TRIAL DEMAND

Plaintiff, on behalf of himself and the Class, hereby demands a trial by jury pursuant to Federal Rule of Civil Procedure 38(b) on all claims so triable.

Dated:  January 2, 2020                    Respectfully submitted,

**AHDOOT & WOLFSON, PC**

By: s/  Tina Wolfson
          Tina Wolfson

Tina Wolfson
twolfson@ahdootwolfson.com
Robert Ahdoot*
rahdoot@ahdootwolfson.com
Henry Kelston
hkelston@ahdootwolfson.com
10728 Lindbrook Drive
Los Angeles, California 90024
Tel: (310) 474-9111
Fax: (310) 474-8585

**HEDIN HALL LLP**
Frank S. Hedin*
fhedin@hedinhall.com
David W. Hall*
dhall@hedinhall.com
1395 Brickell Ave, Suite 1140
Miami, Florida 33131
Tel: (305) 357-2107
Fax: (305) 200-8801

* *Pro Hac Vice* Application Forthcoming

*Counsel for Plaintiff and the Putative Class*

- 27 -