# EXHIBIT H



March 30, 2009

BY FIRST CLASS MAIL AND
ELECTRONIC MAIL

Ms. Jennifer J. Johnson
Secretary
Board of Governors of the Federal Reserve System
20th Street and Constitution Avenue, NW
Washington, D.C. 20551
VIA EMAIL: regs.comments@federalreserve.gov

Re: Comments on Federal Reserve System 12 CFR Part 205: Docket No. R-1343

Dear Ms. Johnson,

Bank of America Corporation and its bank affiliates (hereinafter, "Bank of America" or the
"Bank") appreciate the opportunity to comment on the proposed amendments to Regulation E that
the Board of Governors of the Federal Reserve System (the "Board") published in the Federal
Register on January 29,  2009.

Bank of America is one of the world's largest financial institutions, serving individual consumers,
small and middle market businesses, and large corporations with a full range of banking, investing,
asset management and other financial and risk-management products and services. Bank of
America provides unmatched convenience in the United States, serving more than 59 million
consumer, and small business relationships with more than 6,100 retail banking offices, nearly
18,700 ATMs and award-winning online banking with nearly 29 million active users.  The Board's
proposal is of great consequence to Bank of America and its customers.

## I.    Executive Summary

The Board has renewed its proposals to require banks to permit customers to opt-out of
discretionary overdrafts for checking accounts and to prohibit the imposition of an overdraft fee
caused by holds placed on certain debit card transactions.  In doing so, the Board withdrew its
original proposal to amend Regulation AA ("UDAP Proposal") and is now proposing to amend
Regulation E.

The Bank continues to support the concept of customer choice in banking in general, and overdraft
fees in particular.  Where feasible, such as transactions conducted at the Bank's proprietary ATMs,
we have adopted the Board's recommended best practice of providing the customer with the
choice of proceeding with or cancelling a transaction that appears likely to overdraw an account.
However, the difficulties of expanding the ability to opt-out of overdrafts to all one-time debit card
and ATM transactions are significant.  Moreover, consumer demand for the ability to opt-out has

Gregory A. Baer
Deputy General Counsel
Corporate Law
730 15th Street, NW
Washington, DC  20005

been more anecdotal than systemic.

The Board's Regulation E proposal is more practical than the original UDAP Proposal. However, the Board's continued focus on targeting a single fee, to the point of requiring stand-alone disclosures and effectively price-fixing that particular fee at $0, strikes the Bank as an unnecessary and disproportionate focus on one component of a well-functioning consumer deposit system.

If the Board insists on implementing a final regulation, there are some important points the Board should consider related to (A) opt-out versus opt-in; (B) a bank's ability to alter the terms and features of an account; and (C) the debit-holds rule.

### A.   *Opt-out is superior to Opt-in*

An opt-out approach is far superior to an opt-in approach for a number of reasons:

- Opt-in is likely to lead to customers with no other means of payment being declined when they attempt to purchase necessities, such as groceries and prescription drugs.  We believe that an Opt-in rule would result in approximately 900 million more debit card transactions being declined by the industry in the first year after implementation than an Opt-out rule.  Further, we anticipate that roughly 380 million of the declined transactions will be for necessities, such as groceries, gas and health care.

- Approximately 61% of debit point-of-sale transactions that are authorized at a moment in time when the consumer appears to have a negative balance settle into good funds.  In other words, a significant majority of the transactions that would be declined because of an Opt-in proposal would not have resulted in an overdraft fee.

- We anticipate that the 900 million declined transactions will represent approximately $40 billion of spending.  For many of these transactions, the consumer will not have an alternative form of payment readily available, so the net result will be the loss of a sale for the merchant.  In this economic environment, now is not the time to impose additional pressure on economic activity.

- In contrast, the Opt-out proposal preserves the status quo for the vast majority of customers for whom the current banking system works very well.

### B.   *Banks should be allowed to change the terms and features of the account to meet the customers' needs.*

Similarly, allowing banks to alter the terms and features of their products depending on whether a customer has opted-out or not is preferential to prohibiting banks from altering terms and features.

Allowing banks to alter terms and features will:

- Allow the banks to meet the needs of all of their deposit customers by developing products and services designed and priced appropriately for different customer segments.

- Ensure that banks can appropriately align their financial interests with the best interests of the customer, leading to greater clarity for and better decision-making by the customer.

**C.    *The debit-holds rule will be difficult, if not impossible, to comply with and has minimal, if any, benefit for consumers.***

The debit holds proposal is a disproportionate response to a modest irregularity in the processing of debit card transactions that affects less than two per cent of Bank of America debit card transactions, and where most of the affected transactions do not involve an overdraft. Bank of America, the largest debit card issuer in the country, does not place holds that exceed the authorization amount, even for pay-at-the-pump authorization requests of $1. We believe that most large banks follow Bank of America's practice in this regard. Our data indicates that fewer than 2% of signature debit transactions involve an authorization that exceeds the transaction amount. Moreover, for most merchant categories, if an authorization happens to exceed the transaction amount, it is usually by a small amount, so the likelihood that a hold in excess of the transaction amount will cause an overdraft is very small. Therefore, while we recognize the Board's concern about this issue, we believe that the Board has overestimated the scope of the issue.

Complying with the proposed rule will be very complicated for most banks. In fact, we believe that some banks will have such difficulty trying to process holds within two-hour safe harbor proposed by the Board that they will simply cease reflecting intraday debit card authorizations in their online banking service. If banks take this approach, it is not clear to us that the result will be a net benefit for consumers.

**D.    Solutions**

If the Board insists on finalizing a rule that gives customers the right to avoid overdraft fees, the Bank urges the Board to adopt a final rule that provides an Opt-out proposal rather than Opt-in. Moreover, the final rule should allow banks to alter the terms and features of the account depending on the customer's opt-out preference.

Regarding the debit holds proposal, if the Board insists on moving forward, it should simply prohibit banks from placing a hold in excess of the amount for which the merchant requested authorization. We believe that such a prohibition would address the Board's largest concern, and such a prohibition would be relatively easy to comply with.

In addition, the Bank recommends some relatively minor clarifications or changes that would help to facilitate implementation.  Specifically:

- The Board should clarify that, as technology becomes available, banks will be able to allow customers to opt-in on a transaction-by-transaction basis, in the same manner outlined by the Board as a best-practice for potential overdrafts at proprietary ATMs.

- The Board should adopt a rule that customers should be allowed to opt back in via the same method by which they opted-out.

- The Board should reconsider its inclusion of recurring debit card transactions in the same category as ACH and check transactions.  Consumers will be confused if banks treat recurring debit card transactions differently than one-time debit card transactions.  In addition, banks may not always be able to tell whether a given debit card transaction is recurring or one-time.  The Board should provide flexibility for banks to treat recurring debit transactions either like one-time debit transactions or like ACH/check transactions.

Finally, given the array of complications potentially resulting from the Board's proposal, and given other new regulatory requirements related to credit card, mortgage and FDIC compliance, the Board should allow sufficient lead time for banks to build and install the technology necessary to comply with this proposal and all of the other rules.  Specifically, we recommend that the Board make the effective date at least two years after the date the rules are finalized.

## II.    General Comments

The Board has proposed amendments to Regulation E to add provisions related to overdrafts. The proposal would limit the ability of a bank to assess an overdraft fee for paying one-time debit card transactions or ATM withdrawals that overdraw a consumer's account unless the bank has provided the consumer with a notice of the right to opt-out of payment of such overdrafts and the consumer has not opted out.  The Board has also proposed amendments to Regulation E that would prohibit a bank from charging an overdraft fee caused by a hold on a debit card authorization if the authorization exceeds the amount of the transaction.

At the time the Board proposed these amendments to Regulation E, it withdrew its UDAP Proposal.  The Bank commends the Board for listening to the responses of interested parties to the UDAP Proposal.  The new proposal is more balanced and realistic than the UDAP Proposal, and we believe it will have fewer unintended consequences than the UDAP Proposal.  However, the new proposal and, in particular, certain alternative aspects of the new proposal, continue to raise concerns for the Bank.

In the body of this letter, the Bank will provide its views on the most significant issues raised by the Board's proposed amendments to Regulation E.  In the Appendix, we respond to each aspect of the proposal about which the Board specifically asked for comment.

A.    The Bank commends the Board for proposing a more fair and workable proposal.

The new proposal under Regulation E is an improvement over the UDAP Proposal for a number of reasons.  As the Bank noted in its July 18, 2008 letter in response to the UDAP Proposal, the current system of banking is a system that is fundamentally fair and beneficial to consumers.[1] Discretionary overdrafts are an integral part of that system.[2]  By moving the proposal under Regulation E, the Board has implicitly recognized that the current system of banking in general and related to discretionary overdrafts in particular, is neither unfair nor deceptive.  We appreciate this recognition by the Board, and we believe that this new approach under Regulation E is consistent with the Board's original intention.

Second, and as importantly, the new proposal goes a long way toward recognizing that the consumer is in the best position to know what transactions he or she has conducted, and that the consumer bears the responsibility for not spending more than he or she has in his/her account. By holding banks accountable for making the decision based on the bank's reasonable belief at the a transaction is authorized, the Board has recognized that a bank should not be held responsible for transactions about which only the consumer is aware.

Third, in its July 18 letter, the Bank highlighted some of the systemic complications that might arise if the current overdraft processes related to checks were altered.  Specifically, the Bank noted that there would likely be a ripple effect through the depository system if customers were to opt-out of overdrafts on checks (the natural effect being that checks would be returned unpaid more frequently, causing deposit processing to slow down for all participants in the depository system).  By moving the proposal under Regulation E and by focusing on one-time debit card/ATM transactions, the Board has mitigated the most serious of the systemic problems that the Bank identified in its July 18th letter.  However, the partial opt-out creates significant issues of its own.  For example, we believe that partial opt-outs will be inherently more difficult for customers to fully understand, and, as we will discuss later in the letter, it will be vitally important that banks have broad discretion to describe their opt-out program in a manner that consumers can understand.

Finally, the Board's proposal to allow banks to alter services, features and terms of a product depending on whether someone has opted out will maximize consumer choice by giving banks the flexibility to design different services, features and terms that will appeal to different

---

[1] The Bank's July 18 letter is hereby incorporated by reference.

[2] As we noted in our July 18 letter, there are many aspects of the payment and depository system that potentially disrupt processing; aspects like: (1)  the check collection system where the depository bank may not learn that a deposited item has been dishonored until after it has made the funds associated with the item available to the customer, and (2) the processing of signature debit transactions where a merchant may not submit a transaction for processing for up to three business days after the it has received authorization for the transaction.  Discretionary overdrafts provide banks with the flexibility to minimize the disruptive effects of these difficult aspects of the payments and depository system in a manner that honors many of the transactions that the customer has initiated.

customer segments. In so doing, the Board will allow banks to innovate in a way that is not constrained by the limiting desires of the segment of customers that want to opt-out. The Bank does not think that the general standard that the Board has proposed as a safeguard against abuse – that the differences in the terms, conditions and feature not be so substantial as to discourage a reasonable person from opting out – is necessary. We believe competition between banks will provide the necessary safeguard against abuse. Moreover, a standard like what would "discourage a reasonable person" is vague and invites litigation. If the Board finalizes such a standard, we would request additional examples of variations that the Board believes are acceptable or unacceptable.

> B.   While the Opt-out Proposal under Regulation E is an Improvement over the
>       UDAP Proposal, the Proposal is not necessary.

In its July 18 letter, the Bank laid out the benefits of the current banking system to all participants, and explained the role that discretionary overdrafts play in that system. The Bank continues to be concerned that the Board, by focusing on one activity and restricting one fee, has not fully taken into account the interconnectedness of the modern checking account.

Customers benefit from the current industry practices through access to a wider variety of services and features at a lower standard cost than at any time in history.[3] Those services and features include:

- Savings mechanisms like automatic recurring transfers between linked accounts and split direct deposits of paychecks or government benefits;
- A variety of payment mechanisms, including debit cards, checks and ACH;
- Unparalleled online banking services, including budgeting tools and Alerts;
- Coast-to-coast ATM access;
- Mobile banking that is becoming more sophisticated every day; and
- Faster funds availability than the law requires. (Bank of America makes a higher percentage of deposited funds available faster than ever before; approximately 98% of deposited items are made available within one business day.)

Discretionary overdrafts are one of these customer benefits. We find that many of our customers appreciate the fact that we will authorize or pay a transaction when there are not sufficient funds in the customer's account.[4] Significantly, 61% of the debit point-of-sale ("POS") transactions

---

[3] According to the recent FDIC study, only about a quarter of bank customers pay any overdraft fees during a year. We know from our own experience that only about 20% of our customers currently pay a monthly maintenance fee in any given month. A majority of Bank of America customers have deposit accounts for which they pay no fees whatsoever.

[4] The Board's own consumer research confirms this general reaction from customers. See e.g., Review and Testing of Overdraft Notices, at p. 14, Macro International (submitted to the Board of Governors of the Federal Reserve System December 8, 2008) ("Participants generally indicated that the overdraft coverage described in the disclosure was a positive feature for those

that we authorize into a negative balance – that is, transactions for which the customer does not have sufficient funds in their account at the time they conduct the transaction – do not result in an overdraft fee.  We believe that these customers know that there will be a direct deposit or other deposit going into their account before processing, and appreciate the fact that we are willing to authorize the transactions despite the apparent shortfall at the time of the transaction.

The Bank recognizes customers don't like to pay fees and that it takes an effort for consumers to keep track of all of the in-flows and out-flows in a modern checking account.  The Bank and the industry have responded to this challenge with innovative tools to help customers avoid overdrafts.  Online banking is a great way to track which transactions have cleared; Alerts can be established to send an email or text message when a customer's balance has dropped below a pre-set level; and Bank of America offers overdraft protection by allowing a customer to link a savings account or credit card account to cover occasional mistakes.

In sum, the current system works well for most consumers.  Even with the improvements in the Board's proposal, mandating an opt-out of a single aspect of the system is likely to have unintended consequences.  For the consumers who opt-out, the consequences are probably fairly obvious – they will have transactions declined that they otherwise would have had approved.  But for other participants in the system, the consequences of an opt-out or opt-in rule may be less obvious.  Consumers, even if they do not opt-out, may see terms, features and services of their accounts altered to adjust for the consequences on the banking system of a mandatory opt-out rule. Merchants will see a decline in transaction volume because of the increase in declined debit authorizations.  We respectfully urge the Board to consider whether it is necessary or wise to target a single process and a single fee without regard to the overall effect on the banking system.

C.    The Board's Proposal for Opt-Out is Superior to the Proposal for Opt-In.

The Board has set forth two parallel proposals.  Under one proposal, a consumer must be informed about the benefits and detriments of a bank's discretionary overdraft service and be given a reasonable time to opt-out of the service before the bank may charge a fee for a one-time debit card or ATM transaction ("covered transactions") that creates an overdraft; if a consumer fails to opt-out within that reasonable amount of time, then the bank may utilize its discretion to pay overdrafts and charge a fee for that service ("Opt-out proposal").  Under the alternative proposal, a consumer must be informed about the benefits and detriments of a bank's discretionary overdraft service; until the customer affirmatively opts-in to the service, the bank may not charge the consumer an overdraft fee for covered transactions ("Opt-in proposal").

The Bank believes that the Opt-out proposal is the better proposal.  The primary difference between the Opt-out and Opt-in proposal is that customers who do not make an active decision

who needed it, or for particularly important transactions.  One felt negatively toward overdraft coverage in general.").

get slotted into the default category[5].  In theory, we would expect that over time, the percentage of people participating in the discretionary overdraft service would move toward the same absolute percentage under either system – that is, if every consumer consciously and promptly made an active choice about whether or not to participate in the discretionary overdraft service, the distinction between Opt-in and Opt-out would not be meaningful.  But our experience with other opt-out/opt-in choices suggests that, in practice, a fair proportion of customers will not actively change from the default choice.  If our experience with other opt-out/opt-in choices is any indication, over 90% of customers will initially end up slotted to the default choice.[6]

Under an Opt-out rule, the customers who do not actively decide to opt-out would remain in the position they are in today, where their bank may utilize its discretion to authorize and pay transactions that would overdraw the account.  In contrast, the Opt-in rule would place customers who failed to opt-in in a position where their bank will be forced to decline transactions that they have initiated.  With that understanding of the primary difference between the two proposals, we turn to discuss why Opt-out is the better approach.

          1.      <u>The effect on the person who does not make a decision is worse under the Opt-in approach than under the Opt-out approach.</u>

The effect of being excluded from discretionary overdraft services can be quite severe.  As the Board noted in its introductory comments to the Regulation E proposal, for those customers who rarely overdraw their accounts, the times they do overdraw may very well be situations where they have desperate need of essential groceries or cash from an ATM.[7]

---

[5] Under the Opt-out proposal, the default category would be participating in the discretionary overdraft service.  Under the Opt-in proposal, the default category would be not participating in the discretionary overdraft service.

[6] The Bank has experience with a few different regulatory or other opt-out requirements.  For example, the Bank has established do-not-call and affiliate-marketing opt-out policies and procedures.  Our experience with the various opt-out options we provide to our customers suggests to us that customers opt out at a rate of somewhere between 2% to 20% of the time, depending on the nature of the activity that the customer is opting out of and depending on how long the opt-out choice has been available.  Based on our experience, we believe it is reasonable to anticipate that opt-out rates and opt-in rates for overdraft services would result in approximately 10% of customers actively choosing to opt-in or opt-out.

[7] See 74 Fed. Reg. 5225 (January 29, 2009) ("However, for consumers who rarely, if ever, overdraw their accounts, the occasional coverage of overdrafts by their institutions may be a positive benefit.  For such consumers, an opt-in regime may result in more declined transactions even though the consumer may have preferred to have the overdraft paid, despite the overdraft fee that may be charged by the consumer's financial institution. Such a consumer could be precluded from completing an important transaction when there are insufficient funds in the consumer's account and the consumer does not have another means of payment. For example, a consumer may need emergency funds and attempt to withdraw such funds from an ATM using a debit card. Or, the consumer may use a debit card to purchase essential groceries or medicine and have no other means of payment. In such cases, if the consumer has not

In our July 18 letter, we predicted that if 100% of Bank of America debit card customers opted out of overdrafts, Bank of America would decline approximately 100 million transactions.[8] Utilizing the 90% figure we provided in the introduction to this subsection (see footnote 4) we believe that it would not be unreasonable to predict that an Opt-in rule would reduce debit card transactions by 90 million purchases per year.  Moreover, 43% of debit purchases made by Bank of America customers are for necessities.[9]  This means if an opt-in rule were adopted, Bank of America alone would decline over 38 million debit card transactions for gas, groceries, health care, telephone and prescription and other drugs in the first year.

If Bank of America represents 10% of the country's consumer deposit base, it is fair to multiply the Bank of America experience by a factor of ten to get a ball park figure for the nation as a whole.  Doing so leads to the conclusion that on the order of 900 million total debit card purchase transactions will be declined by the industry in the first year if an Opt-in rule were adopted; of those, 380 million of those declines would be for necessities.

While it is true that some percentage of these transactions can be conducted by another payment method, such as a credit card, we believe that 21% of Bank of America debit-card holders do not have a credit card.[10]  Given the regulatory pressure on credit card issuers, we expect that number to rise for the immediate future.  This suggests to us that, in the year after the an Opt-in rule is finalized, Bank of America will decline approximately 8 million debit card transactions that involve the purchase of necessities where our customer has no alternative method of payment .  Extrapolating the Bank of America numbers to an industry-wide basis, 80 million transactions initiated to purchase gas, groceries, phone services, health care or pharmaceuticals, would be declined and would not be easily conducted with an alternative method of payment.

---

opted in, the consumer would not be able to complete the transaction if the consumer does not have another form of payment.

"Thus, while an opt-in approach may benefit some consumers, it may not be the optimal outcome for others. In addition, an opt-in rule could result in greater inefficiency for processing systems due to the potential increase in transactions that are declined.  Accordingly, because there are both benefits and costs associated with the opt-in and opt-out approaches, the Board is soliciting comment on both approaches."  Footnotes omitted.)

[8]  In our July 18 letter, we acknowledged that the scenario was unlikely because something less than 100% of customers would opt-out.  However, under an Opt-in rule, unless and until customers opt-in, 100% of customers will start out excluded from the discretionary overdraft service.

[9] Our numbers were derived by sorting transactions by MCC code and looking at the proportion of transactions conducted at supermarkets, gas stations, drug stores, phone services and health care providers.

[10] Note that a recent study by the Board identifies that 27% of consumers do not have a credit card.  *Changes in U.S. Family Finances from 2004 to 2007: Evidence from the Survey of Consumer Finances.* February, 2009. Federal Reserve Board (Page A46).

It is worth emphasizing that almost two thirds of these transactions (61%) would not result in an overdraft or an overdraft fee if they were allowed to proceed as they are under the current system.   Bank of America data shows that 61% of debit POS transactions that have a negative balance at the time of authorization settle into good funds.

In contrast, under the Opt-out approach, the current status quo will be retained for customers who do not actively opt-out.  No customers would be denied the ability to purchase groceries or health care services simply because of the Opt-in rule.  In addition, as evidenced by the 61% of debit card transactions that are authorized into negative funds but do not result in overdraft fees, customers today take advantage of the Bank's current policy of processing credit transactions before debit transactions.  Under an Opt-out rule, those customers would continue to receive that benefit.

For those customers who do not opt-out immediately, but overdraw their account, and receive a fee for that overdraft, notices of their right to opt-out will be sent with their overdraft notice or with their next monthly statement.  While the customer will incur an overdraft fee that might otherwise have been avoided had they opted-out, it is neither a change from the status quo, nor does it make more likely that the purchase of a necessity will be declined.

2.      The Opt-in proposal will result in an increase of approximately $40 billion in declined merchant sales.  The Board should understand the macro-economic effects before implementing an Opt-in rule.

The 90 million declined Bank of America debit purchase transactions translates to something on the order of 900 million debit purchase transactions that would be declined by the industry.  The value of these transactions we believe to be approximately $40 billion per year.  This $40 billion dollars in lost debit card transactions will be felt by merchants who will lose sales.  The macroeconomic effect of an Opt-in rule will ripple through the economy.

In the current recessionary environment, the Board should seriously consider whether the perceived benefits of the Opt-in Proposal outweigh the fact that the economy and the merchant community will bear the burden of tens of billions of dollars in lost transactions.

3.      Notice provided under the Opt-out proposal is more than sufficient to allow the consumer to make an informed decision.

As we have already discussed, the difference between Opt-in and Opt-out will be the default status into which customers who do not actively make a decision will be put.  However, a segment of the customers – customers who care the most about having their overdrafts paid on the one hand or avoiding overdraft fees on the other – will actively select whether to opt-out or opt-in.  It is our belief that customers who want to opt-out want to opt-out because they have paid fees in the past and will make their decision based on the tangible and real aversion to the fees.  For these customers, the notice informing them of their right to opt-out will be adequate to alert them to their right and allow them to make a decision.

However, customers do not have the same tangible and real understanding of the benefits of opting-in when presented with a choice in the abstract.  The notice proposed by the Board does a better job of educating customers about the potential downsides of authorizing the bank to pay overdrafts than it does educating customers about the downsides of refusing to authorize the bank to pay overdrafts.  Under the Opt-in proposal, the notice for customers who may want to opt-in is inadequate to alert them to the benefits they are foregoing.[11]

In our view, the Opt-out approach combined with the model notice provided by the Board is more likely than the Opt-in proposal to enable customers to make an informed decision about whether to authorize banks to pay discretionary overdrafts.

4.      Consumers, the industry and the Board have experience with
         regulatory Opt-out.

When the Board and other regulators have mandated specific customer choice in the past, they have tended to do so through an opt-out process rather than an opt-in process.  For example, do-not-call and affiliate-sharing rules have followed the opt-out model.  We believe that the wisdom of the regulators in these examples derives from an understanding that opt-out is generally less intrusive on a relatively well-functioning marketplace than opt-in.  Many would argue that the privacy rights protected in the do-not-call and affiliate-sharing regulations are far more important and affect a far greater number of people than discretionary overdrafts.  If opt-out has been implemented in these areas with apparent success, it is difficult to understand why the Board would consider the more intrusive approach of opt-in in this situation.

5.      If the Board chooses the Opt-in proposal, the hybrid approach
         would help avoid disruption to both Banks and consumers.

In its proposal, the Board asked for comment about whether a "hybrid" approach is an appropriate way to manage some of the operational difficulties inherent in the Opt-in approach. Specifically, the Board asked for comment about whether the final rule should reflect an "Opt-out" approach for existing customers, but "Opt-in" for new customers.  In describing the hybrid approach, the Board noted the difficulties in mailing notices to all existing customers and handling responses to such a mass mailing.

For the reasons stated above, Bank of America strongly believes that Opt-out is more appropriate than Opt-in in all circumstances.  The operational difficulties created by the Opt-in proposal would be mitigated by the hybrid approach.  But the operational difficulties are merely one

---

[11]   In fact, under an Opt-in system, the only time customers are notified of their right to opt-in is at the time of preliminary notification.  Under the Opt-in proposal, a customer who fails to opt-in, is never provided with a reminder of his right to opt-in.  We think customers will be confused when they have transactions declined, but, unlike with the opt-out notice, banks will not necessarily provide notification to the customer of the right to opt-in.   Given the Board's own expression of concern for customers who rarely overdraw and who may find themselves in the position of needing emergency cash or purchasing power, it is odd that the notice requirements and the model notice do not adequately warn consumers about the dangers of opting-out.

aspect of what is wrong with the Opt-in proposal. However, if the Board insists on proceeding with Opt-in for new customers, for the reasons identified by the Board in its commentary, the Bank strongly urges the Board to retain Opt-out for existing customers.

D.      Product Level Opt-out is superior to Account Level Opt-out; the freedom for banks to differentiate terms and features is important for maximizing customer choice.

The Board has proposed two versions of their rule, one allowing Opt-out at the "Product Level" and one requiring Opt-out at the "Account Level." Under the Product Level approach, banks would be allowed to change the terms and features of an account based on whether a customer has opted-out. Under the Account Level approach, banks would be prohibited from making any alterations to an account based on a customer's decision to opt-out.

We commend the Board for recognizing, under the Product Level Opt-out proposal, the importance of allowing institutions the flexibility to meet consumer needs by allowing them to alter the terms and services offered to a consumer based on the consumer's decision to opt-out. Consumers who opt-out of the discretionary overdraft service may have different needs and concerns than customers who remain in the discretionary overdraft service, and those different needs and concerns are best met by allowing banks the flexibility to alter the terms and services associated with the product.

In contrast, the Account Level Opt-out proposal ignores the reality of modern banking. As we noted above, the modern checking account has a number of intertwined features and services that are difficult to disaggregate. It is very difficult to mandate a change in one feature or service without having repercussions in many other features or services of the account. If the Board were to approve an Account Level Opt-out, and prohibit banks from designing products and services specifically for customers who opt-out, then the Board would empower the customer segment to whom the opt-out appeals to dictate the products and services that would be available to the rest of the population.

1.      Banks will innovate to meet the different needs of different customer segments, but they should not be required to apply the desires of one small customer segment to all customers.

Banks develop products and features that have different appeal to different customer segments. Some products and services develop into a product with such broad-based appeal that they become the norm. For example, ATM machines have developed into a channel for delivering cash so ubiquitous that every checking account offered by Bank of America offers customers ATM access. Other products and features will not appeal to everyone, and banks may alter aspects of an account to accommodate those to whom the specific feature appeals. For example, Bank of America has recently rolled out its *SafePass* product. *SafePass* is an optional second layer of protection for a customer's most sensitive Online Banking transactions. *SafePass,* by definition, will only appeal to the Bank's online banking customers, and it comes with a separate price.

There is a customer segment to whom the right to opt-out of discretionary overdrafts will appeal. It is the Bank's belief that the segment is relatively small. According to the FDIC, fewer than 25% of customers incur an overdraft fee in any given year. Within that 25% of customers, some customers will recognize the value of the discretionary overdraft system and some will recognize value in opting-out. For arguments sake, assume that the 25% is split evenly between customers who opt-out and those that do not. The result will be that the opt-out feature will appeal to approximately 12.5% of the banking customers.

One-eighth of the customer base is a large enough customer segment to warrant banks investing time and effort to develop products and features specifically designed to meet the desires of the segment. In fact, banks have already developed numerous tools to help customers track balances and manage accounts in an attempt to meet the needs of this segment. Alerts are particularly useful for the customer segment that is concerned about avoiding overdrawing their accounts. Similarly, the variation in overdraft protection products in the industry is clearly designed to appeal to customers who are at risk for overdrawing their accounts.

But 12.5% of the customer base should not be allowed to dictate product offering and innovation that will affect the other 87.5% of the customer base. To require banks to develop a product to accommodate a customer who wishes to opt-out without allowing the banks to alter any of the terms or pricing will create unnecessary cost and burden on the institutions.

For example, a PIN-only card may be a very appropriate tool to offer to a customer who opts-out of discretionary overdraft services. [12]   However, if banks are not allowed to vary the features of

---

[12] As the Board is aware, under current practices, signature debit transactions involve a two-step process, where the merchant first obtains an authorization and then, some time later submits the actual transaction for payment. Currently, for most transactions, merchants are allowed to wait up to three business days between the time that they request authorization for a transaction and when they must submit the transaction for payment. In contrast, PIN transactions are really a single communication where authorization and the submission of the actual transaction effectively occur at the same time. Since the potential delay in the submission of signature debit transactions creates some of the complications in accurately stopping overdrafts from occurring in the first place, someone who has opted-out may be better served by being provided with a card that works only on the PIN networks. Since PIN-only cards can be designed to have very similar acceptance by merchants as signature debit cards if a bank has relationships with a variety of PIN networks, the consumer may notice little difference between a PIN-only debit card and a signature debit card.

As we described in our July 18 letter, debit transactions conducted through signature debit networks present different risks and rewards than debit transactions conducted through PIN networks. Banks develop their debit strategies, including negotiating with network providers and establishing internal pricing strategies, with the knowledge of the different dynamics of the respective payment networks. The terms and conditions may vary depending on what the institution has negotiated with the networks and what the network has negotiated with the merchants who accept their cards (there is intense competition between the various PIN and signature networks, resulting in different financial dynamics depending on the networks involved). The risk of fraud for transactions may be different as well; and since Bank of America offers "Total Security Protection," protection against fraud over and above what Regulation E requires, Bank of America bears the costs associated with fraud losses. In short, offering a PIN-only card may appeal to customers who opt-out of discretionary overdrafts, but such a card may require the institution to alter the account pricing to adjust for the different financial and risk profiles associated with a PIN-only card.

an account, it is not clear whether banks would be allowed to make a PIN-only card part of the opt-out account if signature debit functionality remained available for customers who don't opt-out. Moreover, the financial aspects (revenue, costs, risk of fraud) of PIN and signature debit processing are different, so it may not make sense to price a PIN-only account the same way as a signature debit account.

If banks are prohibited from offering a PIN-only card to those customers to whom it will appeal, that would end up restricting customer choice. But, if banks are not allowed to take into account the different financial and risk profiles associated with offering a PIN-only card by altering the pricing of the account, then banks will not be inclined to offer the PIN-only card. Only by allowing the banks the flexibility to alter the terms, features and services associated with an opt-out account can the Board maximize customer choice.

> 2. <u>Allowing and encouraging product differentiation based on opt-out will increase transparency, and will allow customers to make better decisions.</u>

As noted above, while the Bank appreciates the benefits of restricting the opt-out to one-time debit and ATM transactions, the Bank is concerned that this partial opt-out approach will require greater clarity and precision in communicating what the customer is opting out of in order for the customer to make an informed decision. There is a real concern that customers who decide to "opt-out of overdrafts" and who do not take the time to understand what that means, will be surprised and dissatisfied when a bank pays a check, an ACH or a recurring debit transaction into overdraft and charges a fee for it. This potential for customer confusion can either be addressed through a mandated disclosure or through allowing the market to develop the right incentives for the industry to provide clarity and transparency.

In its proposal, the Board expressed a concern about potential "steering" if banks are allowed to alter products and services based on the opt-out decision. The Board has proposed that if it were to allow variation in the products and services based on a consumer's opt-out decision, it would do so only to the extent that the variation not "discourage a reasonable consumer from opting out." The Board's concern about improper steering appears to ignore the highly competitive nature of consumer banking. The Board's concern appears to derive from an assumption that a consumer will have only two choices from a single institution: (1) an account with discretionary overdrafts, or (2) an account without discretionary overdrafts. In reality, the choice will not be between two products at a single institution, but rather, between the array of products offered in the marketplace. Banks that want to attract customers will develop opt-out accounts, and competition will force all banks to offer competitive opt-out products very much like it did with "free" checking. Any bank that does not offer an attractive opt-out account will not be able to attract customers who want the opt-out feature. If the demand for Opt-out is as significant as the Board appears to believe, then there will be little or no need for the rule prohibiting variations that would "discourage a reasonable person from opting out" because competition will drive the development of the product.

We believe that the danger of steering is actually greater if banks are prohibited from adjusting their products to reflect the underlying economics of the services provided.  If banks must offer the same products and services at the same price to customers to whom it will have different risk and revenue streams, banks will have a short-term financial incentive to discourage customers from choosing the more costly or less profitable approach.  In contrast, if banks are given the freedom to adjust pricing, banks can adjust their financial incentives to align with customer choice, no matter what the customer chooses.

We also think that aligning a bank's financial interest with customer choice will lead to greater transparency for the customer.  If the bank is allowed to create products for which its interests will be aligned with the consumer, it will be in the bank's self-interest to ensure that the consumer makes the correct choice for themselves.  This alignment of interests will lead banks to clearly identify the benefits and drawbacks of both accounts that allow discretionary overdrafts and accounts where the customer opts-out of discretionary overdrafts.

Moreover, customers who are offered products with different terms and features are more likely to ask questions and get more information about the differences in features and the reasons for the difference in features.  Banks that have differentiated products will focus customers on the differences in the products, and an important part of that focus will be on the different approaches to overdrafts.

Allowing banks to differentiate products and services will both align the banks' and the customers' financial interests and will more likely focus the customer on the differences between opting-out or not.  This will lead the customer to make a more informed and better decision.

> E.   The Board should not allocate responsibility for the non-authorized transactions to the banks.  Rather, the responsibility for non-authorized transactions should lie first with the consumer and secondly with the merchants.

As we noted in our general comments, by adopting a reasonable belief standard, the Board has appropriately recognized that the consumer, not the bank, is primarily responsible for keeping track of transactions affecting the consumer's account.  However, the Board stopped short of fully embracing this important principle when, in its official commentary, it clarified that transactions the bank does not authorize fall outside the reasonable belief exception.[13]  The

---

[13] The proposed official staff commentary provides in relevant part, "Examples of transactions not submitted for authorization.  The exception under § 205.17(b)(5)(i) permitting an overdraft fee to be charged to a consumer's account when a financial institution has a reasonable belief that the consumer has sufficient funds available for the requested transaction does not apply where the transaction is not submitted to the institution for authorization.  Under these circumstances, the general rule in s 205.17(b)(1) prohibits the institution from assessing a fee on the consumer's account for paying or honoring an ATM withdrawal or one-time debit card transaction that overdraws the consumer's account if the consumer has opted out of the institution's overdraft service.  If otherwise permitted under applicable law, the institution may debit the consumer's account for the amount of the overdraft."

Board also repeated the error it made in the debit holds proposal by placing responsibility for transactions that a bank does not authorize on the bank, when, to the extent that the responsibility is not going to be assigned to the consumer, it should be assigned to the merchant and the card associations.

The Board acknowledges that, when a merchant has not submitted a transaction for authorization, "the consumer's financial institution would be unable to decline the transaction if the consumer did not have sufficient funds in the consumer's accounts."[14]  The Board, however, ignores the burden paying these transactions into overdraft places on the banks in favor of the protections it provides to the consumer.   This allocation of responsibility to the banks rather than the consumer ignores the obvious reality that the consumer knows about the transaction at the time it is conducted and the bank does not.  In fact, these transactions about which the bank has no knowledge are precisely where the consumer is in the best position to track their own balance and avoid overdrawing their accounts.  It is these transactions where the bank is the most powerless because it does not know that the transaction was even conducted, much less the amount of the transaction.

Accepting for the sake of argument that the consumer does need assistance in addressing the situations where the bank does not authorize the transaction, the Board fails to consider that there are other parties involved in the transaction to whom the responsibility may be allocated.  As with the debit holds proposal, the Board need consider a more holistic approach to this regulation and contemplate whether it should regulate the merchants, card processors and/or card associations.

> F.   Notice requirements appear to escalate overdrafts above all other disclosures, which will do a disservice to the average customer.

In its proposal, the Board has published a rule that requires that a separate notice be provided to the consumer outlining the consumer's right to opt-out, and the Board has provided a model notice.  The Bank recognizes that the Board believes rights related to opting out of overdraft services are important; however, by requiring that the notice be provided in a stand-alone document, the Board is elevating the importance of overdraft opt-out above other relevant and important disclosures, including other fee information, interest rate information and error-resolution information.  Considering 75% of customers do not incur overdraft fees, the Bank is troubled by the Board's emphasis on this issue.

Importantly, by adding a separate, stand alone document, the Board is making it that much less likely that the consumers will read the other required disclosures.  As the Board must have observed in other contexts, when consumers are provided too many documents containing different information, consumers can be overwhelmed by the volume of paper.

---

[14]   In the interest of full disclosure, in some situations under the card association rules, an issuing bank may be allowed to refuse a transaction submitted by a merchant that the merchant had not previously authorized.  In practice, it is very difficult for banks to assert this theoretical right.

That said, the substance of the sample long form notice presents an acceptable framework. However, we believe that there will be customer confusion about a number of issues, and we would like the Board to emphasize in its final rule that banks have discretion to modify the disclosure to make it accurate and clear as it relates to a given bank's particular overdraft service. Specifically, as the Board's own customer research indicates that some customers will not understand the scope of their opt-out.[15]  This potential for customer confusion is a significant concern for Bank of America.

We believe that the reminder notice is not necessary, but, if one must be included, it should be convenient and not overwhelming.  The model short form notice provided as part of the new proposal is more appropriate for the monthly statement or overdraft notice than what was included in the original UDAP Proposal.  One clarification we would request is that banks should be allowed (but not required ) to pre-print the notice on all monthly statements or overdraft notices, irrespective of whether a customer has incurred a one-time debit or ATM-related overdraft fee.  While banks will want to tailor the notice only to those customers to whom it will make the most sense, not all banks have the capacity to easily trigger specific notices on monthly statements depending on the type of transaction that triggered the overdraft fee.  There will be sufficient challenge in building the technology required to comply with the proposed rules without also having to build the logic into the statement-printing process to comply with a mandate to only print the notice on statements that include a one-time-debit or ATM related overdraft fee.

> G.   The debit holds proposal, while an improvement over the UDAP proposal, is still unnecessary, unworkable and likely to do more harm than good.

In its UDAP proposal and in the new Regulation E proposal, the Board considers prohibiting banks from imposing a fee if an overdraft is caused by a hold on a debit authorization that exceeds the actual amount of the transaction.  As with other provisions, the new proposal related to debit holds is significantly less disruptive than what was originally proposed.  The Board has attempted to make the new proposal less disruptive in two ways: (1) allowing banks that inadvertently impose a fee in violation of the rule to refund it promptly; and (2) providing a "safe harbor" for banks if they release the holds on certain authorizations within two hours of when the authorization request was made.  However, the Bank still questions whether debit holds are really so significant an issue as to require a specific regulation. In the Bank's experience, less than 2% of signature debit transactions involve a situation where the authorization request exceeds the transaction amount.  We believe that a relatively simple rule that would prohibit

---

[15] See, e.g., Macro International at p. 14 ("On the first day of testing, three of the five participants incorrectly indicated that if they opted out, overdrafts through checks and recurring debit transactions would also not be covered.  For the second day of testing, a sentence was added to the bolded section at the top of the page stating that these types of transactions would not be impacted by a decision to opt out….  However, the addition of this sentence did not have a noticeable effect on consumer understanding; only one in four participants on the second day understood that overdrafts by check would be paid.")

banks from placing a hold that exceeds the authorization request would address the majority of the Board's concerns without raising undue hardship on most banks.

>   1.   <u>The Bank believes that the debit holds provision is not necessary and will cause banks to make less information available to consumers about pending transaction than they do today.</u>

.

The Bank would like the Board to reconsider the need for a debit holds rule at all. In considering the need for a debit holds rule, the Board should recognize that merchants submit an authorization that exceeds the purchase amount for just 1.8% of the Bank's signature debit transactions.[16]  We observed that these transactions are spread across a wide range of merchants, with less than half (43%) occurring in the restaurant and services station categories (categories that the Board indicated were targeted in its commentary on the rules).  In other words, over 98% of Bank of America signature debit transactions today do not involve an authorization request that exceeds the transaction amount and have no threat of having an excess hold placed on the account.

Bank of America, the largest debit card issuer in the country, does not currently place holds on $1 authorization requests generated by pay-at-the-pump transactions.  We believe that other major banks have similar no-hold policies for $1 authorizations.  So, for the transaction type that the Board has identified as causing the most angst, Bank of America customers are not faced with the problem that the Board is attempting to solve.

Moreover, our experience suggests that for transactions other than gas stations, if an authorization differs from the actual transaction, it is usually a very small difference.  For most customers, this variation is insufficient to cause an overdraft.[17]  On the rare occasion that the discrepancy does cause an overdraft, the Bank can usually resolve the issue with the customer if the customer calls and asks us to review the situation.

The Board's proposal, by trying to solve a relatively minor issue of excessive holds, risks creating a much more significant problem for customers.  Bank of America has made great efforts to make its online banking feature as up-to-date as possible.  Amongst other things, we

---

[16] The Board appears to be very concerned about the treatment of pay-at-the-pump gasoline transactions.  Our experience suggests that the vast majority of pay-at-the-pump authorization requests are for $1.  As such, it is rare that a pay-at-the-pump authorization request would ever exceed the actual transaction amount.  We understand that some banks will place a hold on an account for up to $75 when they receive a $1 pay-at-the-pump authorization request.  Bank of America does not place any such hold on pay-at-the-pump $1 authorizations.

[17] One of the items that appears to have a frequent mismatch between authorization request and actual transaction are $0.99 music purchases from iTunes which represent almost half of the mismatched transactions.  For some reason, it appears that iTunes frequently requests authorizations that exceeds the actual transaction amount.  The excess amount averages approximately $0.40.

display most debit card transactions shortly after the authorization is requested.[18]  For most debit card transactions, we are able to provide information about the transaction to the customer through online banking for the duration of the time that the transaction is pending.   We try to integrate all of the transactions about which we are aware into the available balance we provide to our customers.  We believe that our treatment of pending transactions, displaying as many as possible in online banking and subtracting the authorization amount from the available balance we display to the customer, is an important benefit to consumers because it better allows the consumers to update their own checkbooks and provides a more accurate picture of their available balance.

We believe most banks that update available balances on an intraday basis and that provide tracking of intraday transactions through their online banking have built a system reliant upon the holds-setting process – that is, it is an integrated technology that places the hold and adjusts the available balance and reflects the transaction in online banking.  The Board has proposed a safe harbor for banks that release holds within two hours of the authorization of the transaction. We believe banks that try to comply with the safe harbor proposed by the Board may do so by simply removing the holds and the related transactions from the available balance calculation and/or from being displayed in online banking.  The net effect on the consumer will be that they have less information available to them than they do today – the available balance provided to them will be less accurate and transactions may not be displayed in online banking for days after they were conducted.  We think this will result in customer confusion, and could very well result in consumers incurring more overdraft fees because it is more difficult for them to utilize tools like online banking to track transactions.

In light of what the Bank perceives to be a minor concern for a consumer and in light of the potential unintended ramifications of encouraging banks to drop holds, the Bank believes that a debit hold rule is not necessary, and, in fact, will be counterproductive and harmful to consumers.

> 2.    If the Board insists on addressing the issue of debit holds, it should do so through the simple method of prohibiting banks from placing a hold in excess of the amount of the authorization request.

The Board's efforts to implement the debit holds rule suffers from a fundamental flaw in that it allocates responsibility for compliance to the banks without requiring other parties to the transaction to give the banks the information needed to comply with the rule.  A possible solution is to prohibit banks from imposing a hold that exceeds the authorization amount submitted by the merchant.  As we indicated above, over 98% of signature debit authorizations

---

[18] There are important limitations on certain transactions, making it impossible to provide real time information about all debit card transactions.  For example, merchants may, without violating the card association rules, conduct debit card transaction with consumers below certain floor limits without obtaining an authorization from the issuing bank.  In these situations, the bank does not become aware of the transaction until it is actually submitted, sometimes days after the transaction.  In this situation, the bank has no ability to display information about the pending transaction in online banking because the bank has no knowledge of the transaction.

are equal to or less than the transaction amount.  This type of rule would require banks to act on information that they already have and would be relatively simple to implement and enforce. This rule would resolve what appears to be the Board's largest concern, namely banks that place a $75 hold on a $1 gas authorization, with minimal disruption to the intricate fabric of debit processing.

> 3.   If the Board insists on implementing a debit holds rule similar to its proposal, the scope of the rule will only be effective if all parties who play a role in processing a debit transaction align their requirements to the times that correlates with the rule.

The Board's new proposal only applies "in connection with a debit card transaction if the actual amount of the transaction can be determined by the merchant or other payee within a short period of time after the financial institution authorizes the transaction."  In the proposed commentary, the Board clarifies that this rule is targeted to gas stations and restaurants where the merchants know within minutes of the authorization request the actual amount of the transaction. This scope makes some sense, because for these transactions, in a perfect system, there is no reason for a bank to hold more than the actual transaction amount.  But there is a flaw in the system. While the merchant may know the amount of the actual transactions, the Bank has no way of knowing the actual amount until the merchant submits the transaction. The Board's proposal places restrictions on banks without providing the banks with all of the necessary tools and information to effectively comply with the rule.  The scope of the rule would make much more sense if merchants, and all the parties who participate processing of debit card transactions, were required to present final transaction receipts for processing (allowing time for the settlement files to clear across all parties) in a time frame that correlates with the rule.

Specifically, if the Board retains the rule with the notion of a safe harbor, it must align the requirements of the card associations and networks with the requirement placed on the banks. That is, before the Board requires banks to release a valid hold on an account, it should require merchants to submit the actual transaction for processing within a reasonable amount of time after authorization.  To do otherwise unfairly shifts the entire burden onto the one party without information about the actual transaction -- the bank.  More specifically, we think a rule that recognizes that most merchants and most banks conduct batch processing at the end of each business day, and accommodates that existing process, will be most effective.

Please see the appendix for a more complete discussion of the complications that arise from the Board's proposal and a suggestion for a more workable solution to those complications.

> H.   The Board must permit adequate time to allow the banks to implement all of the systemic changes required to comply with the proposed rules.

While the new proposal has made significant progress around some of the most difficult operational issues raised by the original UDAP Proposal, there are still many issues that will need to be addressed.  Any version of the final rule will require significant time and money to allow banks to comply.  As the Board acknowledged in its commentary, because the Board has

moved to an ATM/debit-only opt-out, banks will need more time to develop the systems to distinguish between covered transactions and non-covered transactions.

As indicated above, the debit holds provision is imperfect.  Until the merchants and card associations are delivering all transactions within the safe harbor, banks will be in an untenable position.  The proposal allowing credits after the fact is very helpful – but that too will take development effort – to identify which transactions are refundable and which are not.  If the Board insists on maintaining the two-hour safe-harbor, the technology challenges will be even greater.

The Board is also quite aware that there have been major regulatory changes requiring technology in virtually all aspects of the consumer banking business.  The Board finalized credit card regulations under UDAP and Regulation Z last December; mortgage has numerous regulatory changes that require development; and the FDIC has regulatory changes requiring development.  Building the capability to comply with all of the new regulatory requirements will necessitate full service banks, like Bank of America, to devote a significant portion of its resources exclusively to developing infrastructure and oversight of regulatory compliance.

At a minimum, the Bank respectfully requests two years from the publication date of the final rules to implement the changes.

          I.     <u>In addition to the major issues described above, the Bank is concerned about a number of other issues that the Board should address in its final rule.</u>

In the Appendix to this letter, the Bank will present its views on each of the areas about which the Board specifically requested comment.  Prior to turning to those issues, the Bank would like to take this opportunity to raise four significant issues that appear not to have been addressed in the proposed rule, but which would be helpful for the Board to clarify, or which we believe worthy of extra comment.  Those four issues are (a) transaction level opt-in; (b) method of general opt-in; (c) scope of the exception under § 17(b)(4); and (d) treatment of recurring debit transactions.

          1.     <u>The Board should clarify that a customer may withdraw his or her opt-out decision on a transaction-by-transaction basis where the technology makes such transaction-level opt-in feasible.</u>

In 2005, the federal regulators issued joint guidance around Overdraft Protection programs.  See Final Joint Guidance on Overdraft Protection Programs 70 Fed. Reg. 9127 (Feb. 24, 2005).   In the list of best practices issued under the Overdraft Protection guidance, the Board recommended that banks provide a notice to consumers prior to completion of a transaction on their proprietary ATM if the transaction would overdraw the account based on the balance known to the bank at

the time of the transaction.[19]  Bank of America adopted this best practice.  It is not clear under the proposal whether customers who opted-out would be allowed to opt back in for a given transaction at an ATM.

We believe that customer convenience and choice would be enhanced by specifically allowing customers to opt-in on a transaction-by-transaction basis if the bank is able to provide that service.  Currently, the service is only functionally available at the Bank's proprietary ATMs.  It is conceivable that in the future, either directly through merchant terminals or through a specialized mobile banking device, customers may be able to make transaction-level decisions about whether or not to opt-in to overdraft services.  However, it is unclear under the new proposal whether this previously described "best practice" for ATM transactions is even allowed for customers who have previously opted-out.

We would specifically request that, in the final rule, the Board clarify that offering transaction-level opt-in decisions, where technologically feasible, is still considered a best practice for customers who have opted-out of overdrafts.  The Board should be clear that banks are allowed but not required to offer such a transaction-level opt-in, and that banks be allowed to rely upon the "reasonable belief" standard in establishing its system and standards for notifying the customer of the potential of an overdraft on a transaction-level basis.

2.   <u>The Bank believes that a customer who changes his or her mind after the initial decision should be able to opt back in through the same method s/he opted-out in the first place.</u>

Under the new proposal, the Board provides commentary detailing that banks must make it relatively easy for customers to opt-out of overdraft services.  The Board specifically asks for comment about whether banks should be required to provide a toll-free telephone number or other means, and the Board specifically proposes prohibiting banks from requiring customers to mail in their opt-out request.  The Bank understands that for an opt-out right to be effective, it must be easily accessible to customers.  However, the Bank believes that many customers who opt-out may change their mind when they recognize the benefits of overdraft services, and may want to opt-back-in.  Procedures for opting back in should be no more onerous than the original options for opting.  The customer who opted out by calling a phone number will fully expect to be able to opt back in by calling the same number.

We applaud the Board for acknowledging that electronic communication can be an effective means for opting back in.  We would encourage the Board to also allow customers to opt back in via phone and whatever other channels banks provide for opting-out.

3.   <u>The Board should clarify the exception that it establishes in section 17(b)(4) should be product-specific, not institution specific.</u>

---

[19] The balance known at the time of the transaction is virtually identical to the "reasonable belief" standard established in the proposal.  The reasonable belief standard should continue to apply to ATM opt-in notifications and any other transaction-level authorization requirements.

Section 17(b)(4) of the proposed rules exempts institutions from the Opt-out rule that have a policy and practice of declining to pay any ATM withdrawal or one-time debit card transaction for which authorization is requested when the institution has a reasonable belief that the consumer's account does not have sufficient funds available to cover the transaction at the time of the authorization request.  However, because this exception states that it applies an institution level rather than a product level or business unit level, it is not entirely clear that banks that have certain products or business units that operate within this exception can utilize this exception.  For example, at Bank of America, we offer a prepaid payroll card that falls squarely within this exception.  However, as an institution, we have standard checking accounts that do not currently fall within this exception.  Since the proposed language of 17(b)(4)(i) speaks in terms of the policies of an "institution," rather than policies and practices that apply to classes of products offered by the institution, without additional clarification from the Board, it is not entirely clear that the Bank could rely on section 17(b)(4)(i) for its prepaid payroll card product.  Since the Board would certainly not want to discourage the Bank from continuing to offer products that meet the requirements of the exception, the Board should clarify, either through official commentary, or within the rule itself, that distinct classes of products will be treated differently under the exception.

4.   <u>The Board should allow banks the flexibility to treat recurring debit transactions either like one-time debit transactions or like ACH transactions.</u>

Under the new proposal, the Board segregates the payments world into "ATM-withdrawals and one-time debit card transactions" on the one hand and "checks, ACH transactions, and other types of transactions…" on the other hand.  The Bank recognizes the reason why the Board draws a distinction between checks and debit transactions.   The Bank can even accept that ACH transactions are more like checks.  However, the Bank would like to raise a concern about lumping recurring debit card transactions with checks and ACH, rather than with one-time debit transactions.

A bank's ability to distinguish between one-time debit transactions and recurring debit transactions is limited.  Under card association rules, merchants are supposed to code recurring debit transactions differently than one-time debit card transactions.  Our experience suggests that merchants are inconsistent at best in complying with this aspect of the association rules.  It is a difficult rule for the associations to enforce.  It would take a concerted effort by the associations, the acquirers and the merchants to consistently and accurately distinguish between recurring debit transactions and one-time debit transactions.

Putting aside the issue of merchant coding, consumers are likely to be confused if banks treat recurring debit transactions differently than one-time debit transactions.  Under one version of the proposed rules, the Board would require banks to continue to process all "checks, ACH transactions, and other types of transactions [including recurring debit transactions]" under the same overdraft rules whether the customer opts out or not.  This means that banks who regularly pay all transactions into overdraft today would find themselves required to decline one-time

debit transactions for a customer who opted-out, but required to pay recurring debit transactions into overdraft for the same customer.  This is likely to create customer confusion.

The Bank would propose that the Board allow banks to choose whether to treat recurring debits more like one-time debit transactions or more like ACH transactions.  As long as the bank provided disclosures about which way they were treating recurring debits, the bank would be in compliance with the rule.

IV.     Conclusion

Thank you for the opportunity to comment on the proposed amendments to Regulation E related to overdraft fees.  To the extent you have any questions about material contained in this comment letter, please contact me at 202-442-7573.

Sincerely,

Greg Baer
Deputy General Counsel
Bank of America, N.A.

*Appendix*

**Response to Specific Requests for Comment.**

The body of the letter addressed some of the issues that the Bank wanted to highlight for the Board. However, the Bank recognizes that there are many more issues with the Board's proposal that warrant comment. To that end, the Bank sets forth below its position on each of the specific requests for comment promulgated by the Board.

A.    **Opt-Out:**

1.    **Limit of opt-out for ATM and one-time debit card transactions**

a.    Comment is requested on whether the proposed opt-out should also apply to **recurring** debit card transactions and ACH transactions.

The Bank recommends that the Board allow, but not require, banks to treat recurring debit card transactions like one-time debit card transactions. The Bank agrees with the Board that ACH transactions share more in common with check transactions than with debit card transactions, and would support treating ACH transactions the same as checks.

The Bank's primary concern with the Board's proposal to treat recurring debit card transactions like ACH and check transactions is the issue of customer confusion. We believe that most consumers do not think of recurring debit card transactions significantly differently than one-time debit card transactions. If the Board finalizes the proposal that requires banks to continue to honor checks, ACH and recurring debit card transactions the same whether or not a consumer opts-out, banks may be required to pay recurring debit card transactions into overdraft, but may be prohibited from paying one-time debit card transactions into overdraft. The potential for customer confusion will be immense.

Moreover, our experience is that the only tool banks currently have to distinguish between one-time debit card transactions and recurring debit card transactions is a code provided by the merchant as part of the authorization process. A bank's ability to comply with a requirement to treat recurring debit transactions differently from one-time debit transactions is wholly reliant upon the merchants. Our experience is that merchants are inconsistent at best in coding recurring transactions properly. Any rule that distinguishes recurring debit transactions from one-time debit card transactions will meet with limited compliance unless and until merchants more consistently provide the necessary information.

Therefore the Bank specifically requests that the Board allow (but not require) banks to treat recurring debit in the same manner that it treats one-time debit transactions. Thus, banks should be allowed to (but not required to) include recurring debit as a required opt-out for customers who opt-out.

b.    Comment is also solicited on an appropriate implementation period for the proposed rule.

For the reasons set forth in the body of the letter, the Bank believes that any implementation period less than two years will place undue strain on the industry, and will risk substantial non-compliance.

      2.      **Reasonable opportunity for opt-out.**

          a.      Comment is requested regarding whether [the 30 day time period is reasonable to allow a customer to opt-out after having received notice or whether] a shorter time frame, such as 15 or 20 days, may be more appropriate.

Given that the right to opt-out will be ongoing, whatever the time period the Board establishes, the Board should allow banks to obtain specific authority at the time of account opening if opt-in like procedures are followed.

We believe that customers will generally make their decision very quickly – usually at the time of account opening, or upon receipt of a debit card and/or the notification around this. We believe that most consumers will not likely rethink the decision that they make at the time that they receive the notification, thus thirty days appears unnecessary. Ten to fifteen days strike the bank as more than adequate for the consumer to re-read all disclosures after they have received them, and make contact with the bank through any method they choose.

          b.      Comment is requested whether the board should <u>require</u> institutions to provide a toll-free telephone number to ensure that consumers can easily opt out.

The Bank would be opposed to requiring that any such number be dedicated exclusively to the function of handling opt-outs. However, as long as the Bank's general toll-free customer service number can be utilized to facilitate opt-out requests, the Bank would not oppose a rule that required Banks to provide opt-out through a toll-free number.

          c.      Comment is also requested regarding whether the Board should add examples of methods of opting out that would not satisfy the requirement to provide a reasonable opportunity to opt-out, such as requiring the consumer to write a letter to opt out. (p.28)

The Bank generally believes that the more examples the Board can provide the better. That said, the Bank would ask that the Board put out for comment any proposed official commentary affecting opt-out rights. The Bank does not object to the Board's position that requiring a written letter would not meet the reasonable opportunity standard.

      3.      **Opt-out: Conditioning the opt–out choice on also opting out of checks, ACH or other types of transactions.**

a.      Comment is requested on whether there are other, more effective means of ensuring that consumers are not discouraged from opting out of an institution's overdraft service for ATM withdrawals and one-time debit card transactions.

The Bank acknowledges that some bad actors can take things to an extreme, but, in a competitive marketplace, the Bank is more concerned about attracting customers with the best overall value proposition that meets the customer's needs than it is in discouraging opt-out.  We firmly believe that our long term growth is reliant upon meeting the customer's needs – and we will develop a value proposition that will appeal to customer's who want to opt out.  The knowledge that our competitors will be offering an opt-out product that is appealing to customers will be an effective guardrail, making regulatory requirements unnecessary.

Moreover, as we discuss in the body of the letter, allowing banks to alter the terms and features of an account for customers who opt-out will allow banks to develop products that best align the banks' and the customers' respective interests.  Distinct products will focus consumers on the benefits and detriments of opting-out and of not opting-out.

b.      Comment is requested on the merits of both alternatives [(a) not allowing banks to condition opt-out of debit/ATM on the opt-out of checks, and (b) allowing banks to offer an all-or-nothing opt-out.]

The Board appropriately acknowledged that banks do not have the capacity today to treat an opt-out request differently depending on the type of transaction conducted.  The Board indicated that it will allow sufficient lead time for banks to develop that technology.  With sufficient time to comply with this requirement, the Bank can accommodate a partial Opt-out rule.  It is important to note that a partial Opt-out rule is more likely to lead to customer confusion, as customers who opt-out may think that they are opting out of all overdrafts.  To minimize the potential customer confusion, the Board should clarify that banks have leeway to modify the required notice to accurately reflect the scope of a decision to opt-out.

c.      The Board also seeks comment on other approaches that may sufficiently balance concerns about the potential chilling effects from institutions declining to pay overdrafts for checks and other transactions if a consumer opts out of the payment of overdrafts for ATM withdrawals and one-time debit card transactions against the operational difficulties of implementing a partial opt-out rule.

No comment.

**4.     Opt-out: Implementation of opt-out -- changing the terms of the account for customers who opt-out (account level vs. product level opt-out)**

a.       The Board requests comment on both approaches.  Specifically, the Board requests comment on whether institutions that currently offer an opt-out implement an opt-out at the account level (i.e., with the same type of

account) or at the product level (i.e., by placing the consumer in a separate opt-out account). The Board also requests comment on whether institutions that currently offer an opt-out vary any other terms, conditions, or features of a separate opt-out account, and, if so, which terms, conditions or features are varied and why. (p.32)

Bank of America does not currently offer an opt-out so we do not have experience with varying terms and conditions depending on whether the customer opts-out. That said, please refer to the body of the letter for the importance of allowing banks the flexibility to meet the customer needs through differentiated products.

5.   **Opt-out: Timing of Notice**

a.   Comment is requested whether institutions should be required to segregate the opt-out notice from other account disclosures to help ensure that the notice can be seen by the consumer.

See the body of the letter for our position that segregating the opt-out notice gives the opt-out notice undue weight compared to other important disclosures.

b.   Comment is requested as to whether the rule should permit institutions to include the opt-out notice on periodic statements in any cycle in which the consumer has been assessed an overdraft fee or charge, even if that fee or charge was not incurred in connection with an ATM withdrawal or a one-time debit card transaction. (p. 44). Comment is also requested as to whether institutions should be permitted to include the opt-out notice on the periodic statement if the consumer did not incur any overdraft fee or charge during the statement cycle.

Banks should be allowed (but not required) to preprint the opt-out notice on the monthly statements or OD notices. We recognize the potential for customer confusion – but the potential for customer confusion will also exist in any month in which the customer receives an OD fee for both a debit card transaction and a check. The potential efficiencies of allowing (but not requiring) banks to put the notice on every monthly statement are significant and outweigh the potential customer confusion.

6.   **Opt-out: Initial Notice Content**

a.   Comment is requested whether additional guidance is necessary if an overdraft fee is determined by other means, such as a percentage of the overdraft or the transaction that caused the overdraft. Comment is requested regarding whether the rule should permit or require any other information to be included in the overdraft notice.

In general, we believe banks should be provided more discretion to design their own notice that fairly and accurately describes their own overdraft practices. Such discretion would be

consistent with the general regulatory approach to deposit products, as exhibited by Regulation DD and other sections of Regulation E.

7.      **Opt-out: Continuing Right to opt-out and time to implement opt-out**

a.      Comment is requested regarding the need for additional guidance on the "as soon as reasonably practicable" standard. [This refers to the requirement that banks must respond to a customer's request to opt-out as soon as reasonably practicable.]

The Bank recommends that the Board adopt an approach that is consistent with other opt-out requirements, such as do-not-call and affiliate marketing.

8.      **Opt-out: Duration of Opt-Out**

a.      Comment is requested on whether consumers should also be permitted to revoke prior opt-out elections orally, whether by telephone or in-person.

Consumers should be able to revoke their prior opt-out elections by whatever means that they initially invoked their opt-out rights.  If the Board will require customers to opt-out via the telephone, then customers should be allowed to revoke the opt-out via the telephone.

9.      **Opt- out:  Miscellaneous**

a.      The Board requests comment on all aspects of the opt-out proposal, including the various alternatives set forth in the proposal.  Comment is also requested on the costs and benefits of the proposed opt-out rule to consumers and financial institutions.

As we noted in the body copy of the letter, the Board should specifically allow customers who have opted-out to opt back in on a transaction by transaction basis where technology allows.

The Bank estimates that, between the Regulation DD rules that were finalized in December related to monthly reporting of cumulative overdraft and insufficient fund fees, the basic opt-out proposal and the debit holds proposal, the Bank will need to devote between approximately $30 million to comply with the requirements.  These dollar figures assume that we will be allowed at least two years to implement the required changes.  If we are allowed less time than two years, the costs could go up significantly because we do not currently have the resources to implement the necessary changes on a shorter timeline.

Moreover, the Board should keep in mind that the Bank and the industry have limited technology personnel and resources.  To the extent that the technology resources are devoted to projects designed to comply with new regulations, those resources cannot be used to implement other changes, such as new product development or enhancements to existing products and services. As the Board is aware, in addition to the Regulation E Proposal, the Bank faces new regulation in mortgage, credit card and FDIC compliance.  As a result, banks like Bank of America will

have very few technology resources available to develop new products and services to serve our customers.

**B.    Opt-In:**

       **1.    Alternative Opt-In Requirement**

              a.    The Board is also soliciting comment on an alternative approach -- an opt-in approach.

Please see the body of the letter for our discussion of why Opt-out is better for consumers and merchants than Opt-in.

       **2.    Opt-in: Conditioning the opt out on also opting out of checks, ACH or other types of transactions**

              a.    Comment is requested on the merits of both alternatives [(a) not allowing banks to condition payment of checks/ACH on the payment of debit/ATM , and (b) allowing banks to condition payments of checks/ACH on the payment of debit/ATM.]

Our view of this issue is the same for both the Opt-in and the Opt-out proposals.  Please see our response in the body of the letter.

       **3.    Opt-in: Implementation of opt-in -- changing the terms of the account for customers who opt-out (account level vs. product level opt-out)**

              a.     The Board requests comment on both approaches.  For institutions that require consumers to opt-in to the institutions overdraft service, the Board requests comment on whether the consumer's choice is implemented at the account level (i.e., within the same type of account) or at the product level (e.g., by placing the consumer in a different type of account).

Our view of this issue is the same for both the Opt-in and the Opt-out proposals.  Please see our response in the body of the letter.

              b.    The Board also requests comment on whether institutions that currently require an opt-in for overdraft services, or that offer accounts to certain subsets of consumers (such as high-risk consumers) that limit the consumer's ability to overdraw the account, vary any other terms, conditions or features of the account depending upon whether the consumer opts in or not.  If so, comment is solicited on which terms or features are varied and why.

Our view of this issue is the same for both the Opt-in and the Opt-out proposals.  Please see our response in the body of the letter.

4.    **Opt-in: Timing of Notice**

   a.    The Board solicits comment on whether another approach may be more appropriate for existing customers [an approach other than requiring notifying all existing customers, and removing all customers who have not responded to the notice within 60 days from overdraft services]. Specifically, the Board requests comment on whether it should adopt a hybrid approach consisting of an opt-out rule for existing accounts and an opt-in rule for new accounts.  Under this approach, an institution could continue to pay overdrafts and assess fees for ATM withdrawals and one-time debit card transactions for existing customers who have not opted out, but would be prohibited from paying such overdrafts and assessing an overdraft fee or charge on new customers who have not affirmatively consented to the institution's overdraft service.

Please see the body of our letter for a discussion of why, if the Board finalizes an Opt-in rule, the hybrid approach is preferable to a total Opt-in approach.

5.    **Opt-in: Miscellaneous**

   a.    The Board requests comment on all aspects of the opt-in proposal, including the various alternatives set forth in the proposal.  Comment is requested on the costs and benefits of the proposed opt-in rule to consumers and financial institutions.  Comment is also solicited on which approach (opt-out or opt-in) may be optimal for both consumers, and whether one approach may present unique operational or costs issues that would not be associated with the other approach.

Our view of this issue is the same for both the Opt-in and the Opt-out proposals.  Please see our response in the body of the letter.

C.    **Debit Hold:**

   a.    The Board requests comment on all aspects of the debit hold proposal, including whether additional guidance is necessary regarding transactions in which the actual purchase amount is determined "within a short period of time."  Comment is also requested on the costs and benefits of the proposed rule to consumers and financial institutions.

   b.    Comment is requested on the appropriateness of the proposed safe harbor, including whether other time periods may be more appropriate in light of operational constraints at smaller institutions which may only receive authorization and settlement information periodically during the day.

       c.      In addition, comment is requested whether the Board should exercise its authority under Section 904 of the EFTA to also require merchants (or their acquirers or processors) to promptly submit transactions covered by this rule for settlement. Specifically, the Board seeks comment on whether the final rule should also require merchants (or their acquirers or processors) to submit such transactions for settlement within the safe harbor period.

Please see the body copy of the letter for the Bank's description of why a debit holds rule is not necessary at all, and for one alternative rule that would achieve the majority of the Board's goal. In addition to information provided in the body copy of the letter, the Bank has the following additional concerns about the debit holds proposal.

As we noted in our July 18 letter, the processing of a debit card transaction has a number of components that occur outside the issuing bank's control. In a standard signature debit transaction, when the consumer swipes his or her debit card, the merchant requests authorization to complete the transaction. The authorization usually specifies the amount of the transaction, and the authorization request is an important mechanism for the merchant to verify that the customer's bank will pay the transaction. If the issuing bank provides the authorization, then, as long as the merchant complies with rules around timely submission of the transaction, the issuing bank is contractually obligated to pay the merchant. Under current rules, merchants may submit most signature debit transactions up to three business days after they have made their authorization request. Thus, because banks become obligated to pay the merchant the amount of the authorization, and because the merchant may not submit the actual transaction for up to three business days, many banks will place a hold equal to the amount of the authorization, effectively treating the consumer as though they had already spent the money.[20]

While obtaining transaction authorizations at the time of a purchase can happen within seconds, submitting transaction receipt records for clearing is not an instantaneous process. Transaction receipts route from the merchant back through the card associations, merchant processors and issuers then back to the processor providing the settlement funds that will be deposited to the merchant's bank account all of which could take several minutes per transaction. The timing also varies depending on the type of point of sale equipment each merchant uses. For example, if a merchant is running his equipment through phone lines versus the internet the process to clear a transaction for settlement will be slower and take more time. The reason the card association operating regulations permit merchants to take up to three days to submit their receipts for settlement is so that the merchant does not have to disrupt serving its customers during its business hours. If a merchant had to settle each receipt "real time" or even within hours while still open for business they would likely lose sales and customers. These time

---

[20] From a consumer's perspective, they have already spent the money at the time the bank places a hold. The consumer has received their goods or services and need do nothing else to consummate the transaction. Banks who have the capability to do so will also utilize the hold amount to update on an intraday basis the available balance information that it provides to consumers, and will utilize the hold amount and information from the authorization request to display the transaction in online banking.

periods allow merchants to perform this more administrative type function after its close of business.  Smaller businesses may also not accumulate enough transactions each day to perform this function so often wait the three days to collect its transactions for processing.

There are times when the amount of the authorization may differ from the amount of the actual transaction.  Some examples that people can easily relate to are pay-at-the-pump gas station transactions where the merchant will request authorization before the amount of the purchase is known; and restaurants, where merchants used to be authorized to add a percentage as a potential tip at the time of authorization, but before knowing whether the customer was actually going to provide a tip.

The card associations (for example, Visa and MasterCard) are responsible for the operating rules that may permit merchants to submit an authorization request that is different from the actual transaction and how long after an authorization a merchant may wait to submit the transaction for processing.   These rules are provided to benefit cardholders who want to make purchases using a credit or debit card but protect the merchant from the possibility that funds may not ultimately be available when the final transaction is submitted.  The card associations enforce their rules through acquiring banks.

In addition to the rules that establish these guidelines, one must also understand that the entire card network, including merchant processors and issuing banks, is designed to distinguish credit cards and signature debit transactions separately from a PIN debit transaction.   The system recognizes a PIN transaction differently allowing it to settle in a quicker fashion than credit card and signature debit transactions.  Modifying the timing associated with submitting signature debit transactions would require a modification to the systems of each of the card organization, merchant, merchant processors and issuing banks.

We provide this framework in order to point out how the new debit holds proposal is not directed at the correct parties.  In a normal signature debit transaction, the merchant, in accordance with the association and network rules determines how much to submit as an authorization, how much to submit for an actual transaction and when to submit the actual transaction.  The merchant has agreed to abide by rules established by the card association, not rules established by the issuing bank.  If the issuing bank authorizes a transaction, it is obligated to pay the merchant up to the amount of the authorization, but it has no control over the accuracy of the authorization nor does it have control over the timing of the submission of the transaction.

The proposed debit holds rule prohibits the issuing bank from imposing an overdraft fee if the amount of an authorization hold exceeds the transaction amount and if the excess hold caused the overdraft.  The proposed rule allows for an exception in situations where the merchant can know the actual transaction amount within two hours of the authorization request (like gas stations and restaurants) and where the bank releases the hold within that two-hour safe harbor.  The proposed rule noticeably does not actually require the merchant to inform the bank of the transaction amount within two hours of the authorization; rather, it implicitly requires the bank to release the hold within those two hours even if the merchant does not submit the actual transaction for three days.  The scope of the rule would make much more sense if merchants, and all the parties who participate processing of debit card transactions, were required to present final

transaction receipts for processing (allowing time for the settlement files to clear across all parties) in a time frame that correlates with the rule.

Specifically, if the Board retains the rule with the notion of a safe harbor, it must align the requirements of the card associations and networks with the requirement placed on the banks. That is, before the Board requires banks to release a valid hold on an account, it should require merchants to submit the actual transaction for processing within a reasonable amount of time after authorization.  To do otherwise unfairly shifts the entire burden onto the one party – the bank -- without information about the actual transaction.

- At the very least, safe harbor should be extended to the end-of-day, rather than two hours after the authorization.

In its new proposal, the Board creates a safe harbor for institutions that have "policies and procedures in place designed to release debit holds … within a reasonable period of time."  The Board then defines "reasonable period of time" to mean "two hours."

This concept of a safe harbor is an interesting and useful idea, but the two-hour definition is neither practical nor necessary for either merchants or banks that conduct batch processing.

Many merchants, particularly small and medium-sized businesses, batch process their signature debit transactions at the end of a day.  If the Board were to implement a two-hour rule, it would effectively require merchants to move from a once-per-day batch system, to a constant, real-time processing system.  It is not a simple matter for merchants to submit transactions more quickly than once per day, and these changes are complicated by the diverse nature of the merchants impacted.  For many merchants, such a change would require the purchase of new point-of-sale terminals and reprogramming of terminals for every checkout aisle in every store.  In addition, such a change may require merchants and/or their acquirer to make changes to mainframe system code.  The Bank anticipates that such an upgrade would cost merchants hundreds of millions of dollars.  In addition to the merchants, the card processors would also have to improve their capacity to handle intraday processing.

Similarly, most issuing banks do not process transactions in real time, but rather, gather all transactions conducted or received during a day in a batch and process them at night. Most banks reorder transactions during the batch processing.   Most banks do not determine whether an item "overdraws" an account until processing at night, and hence, do not impose a fee for overdrafts until batch processing.  Thus, for banks that batch process, from the perspective of whether or not to impose a fee for overdrawing an account, the only important time by which a bank need drop a debit authorization hold is prior to processing on the business day that the hold is placed.

We, therefore, suggest that the Board consider a rule for merchants and banks that conduct batch processing that allows for the safe harbor to extend to the end of the day.[21]  Merchants should be

---

[21] Such a rule is actually much more complicated that it may appear on its face.  To be effective, the issuing bank must actually receive the transaction information in a timely manner so as to be able to incorporate the transaction information into its nightly processing.  As we noted, it is not

required to submit transactions once per day, giving a reasonable time for card processors to process the transaction and for banks to receive and process the transactions and release the holds. Banks could then reasonably be required to have policies and procedures designed to release an authorization hold prior to processing on the business day on which the debit hold was placed. From a fee perspective, the practical effect of an end-of-day rule will be identical to the proposed two-hour safe harbor. The only real difference between the two-hour rule proposed by the Board and the end-of-day rule will be that, under the end-of-day rule because of the hold, the bank may decline some intraday transactions that it would otherwise approve.[22]

Both a two-hour rule and an end-of-day rule would require significant development by merchants, processors and banks. But an end-of-day rule would require relatively less development/technology, so would achieve the purpose of the rule at a much lower cost. Merchants, processors and banks that are currently set up for batch processing will have a significantly easier time making adjustment to the existing processing system than they will creating an artificial intraday capacity. Thus, to the extent the Board is moving in the direction of regulating the merchants or otherwise encouraging quicker processing, an end-of-day rule will be more achievable than a two-hour rule.

---

sufficient to impose a rule merely on the merchants and the issuing banks. The rule would have to be designed to require each player in the processing to move the transaction along in a timely manner to the next person in the chain. An apt model for what the rule might entail is the check processing model that imposes a funds-availability requirement on the depository bank and midnight deadlines on each processing bank in the chain.

[22] To illustrate the prior-to-processing rule, we present an example of how the Board's proposal might work. A customer starts day 1 with $100 in his account. Customer conducts a pay-at-the-pump signature debit transaction at noon, and the bank places a hold in the amount of $75 on the account. The customer only pumps $25, but the merchant does not submit the actual transaction until day 2. At 1:00 pm, the customer uses a PIN debit transaction to purchase $35 worth of groceries, and at 3:00 pm, the customer again uses a PIN debit transaction to buy a new pair of shoes for $30. The two PIN debit transactions are processed as part of batch-processing on the evening of day 1. Absent any debit holds rule, a bank that batch processes will maintain the $75 hold through processing, but, if it authorized the two intervening transactions, it will impose two overdraft fees on the customer.

　　　　If the debit holds rule is implemented with a two-hour safe harbor, the bank will release the $75 hold at 2:00pm, and neither of the subsequent transactions will receive an OD fee. Importantly, if the customer has opted-out, and if the bank updates the available balance on an intraday basis, the $35 transaction conducted at 1:00 pm will be declined, but, because the hold is released at 2:00 pm, the $30 transaction will be approved

　　　　If the debit hold rule is implemented with an end-of-day rule, the bank will release the $75 hold prior to processing that night, and neither subsequent transaction will receive an OD fee. Importantly, if the customer has opted-out, both the 1:00 pm and 3:00 p.m. transactions will be declined. Thus, there is no difference in overdraft fees charged between the two-hour hold rule and the end-of-day rule. The only difference will be that, on the margin, there may be a few more transactions declined because the hold remained in place longer than it otherwise would have.

　　　　It is worth emphasizing that the prior-to-processing rule will be effective in protecting customers from inappropriate overdraft fees even over weekends and other periods when the bank does not process items.

- If the Board finalizes the debit holds provision and safe harbor provision, the Board should clarify that the classes of transactions covered by the rule can be determined by looking at MCC codes.

The Board has proposed that the debit holds provision apply to classes of transactions for which "the actual amount of the transaction can be determined by the merchant or other payee within a short period of time… ."  In its commentary, the Board clarified that its primary concern is with gas stations and restaurants.

The Bank respectfully requests that the Board provide a little more precision about this requirement.  Specifically, the Bank requests that the Board identify MCC codes under which transactions are submitted that will be covered by the proposed rule.  As the Board is aware, every merchant submits transactions through a Merchant Category Code.  Large merchants may have their very own MCC code.  Smaller merchants are categorized by the nature of their business.  A merchant's MCC code is the primary mechanism by which an issuing bank is able to identify the nature of the transaction being conducted.

While banks can make educated guesses about which merchants and which transactions will be subject to the debit holds rule, it would be much clearer for the industry if the Board were to specifically identify which categories of merchant, by MCC code, are transactions that "can be determined by the merchant or other payee within a short period of time…"

Sincerely,

Greg Baer